UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| [UNDER SEAL],<br><br>Plaintiffs,<br><br>v.<br><br>[UNDER SEAL],<br><br>Defendant. | COMPLAINT<br><br>Case No.<br><br><br>**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |

**DOCUMENT TO BE KEPT UNDER SEAL**

Nola J. Hitchcock Cross

Cross Law Firm, S.C.
The Lawyers Building
845 N. 11th Street
Milwaukee, WI 53233
Phone: (414) 224-0000
Fax: (414) 273-7055
Email: njhcross@crosslawfirm.com
mflanner@crosslawfirm.com

Attorneys for [under seal]

**Filed Under Seal Pursuant to 31 U.S.C. § 3730(b)(2)**

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

UNITED STATES of AMERICA, *ex rel*. COLLEEN VAN EGEREN,

STATE OF MICHIGAN, *ex rel*. COLLEEN VAN EGEREN,

and

COLLEEN VAN EGEREN,

Plaintiffs and Relator,

v.

THE NEW DERMATOLOGY GROUP, LTD.,

and

KEVAN G. LEWIS, MD,

Defendants.

FALSE CLAIMS ACT COMPLAINT

## Table of Contents

**I. INTRODUCTION TO THE FRAUD ..... 5**

**II. STATEMENT OF THE CASE ..... 9**

**III. FEDERAL JURISDICTION AND VENUE ..... 10**

**IV. PARTIES ..... 10**

**A. Relator ..... 10**

**B. Government Plaintiffs ..... 11**

**C. Corporate Defendants ..... 11**

**D. Individual Defendant ..... 11**

**V. LEGAL AUTHORITY ..... 12**

**A. The False Claims Act ..... 12**

**B. Medicare and Other Federal Healthcare Programs ..... 14**

**1. Medicare Payment for Physician Assistant "Incident-to" Services ..... 17**

**2. Medicaid Payment for Dermatology Services ..... 20**

**VI. FACTUAL BACKGROUND ..... 22**

**A. Relator Colleen Van Egeren ..... 22**

**B. Defendant NDG's Organizational and Operational Structure ..... 23**

**VII. DEFENDANTS' FRAUDULENT CONDUCT AND FALSE CLAIMS ..... 27**

**A. Defendants' "Incident-to-Billing" & Unsupervised PA Scheme ..... 27**

**B. Defendants' Complex Closure Upcoding Scheme ..... 31**

**C. Defendants' Medically Unnecessary Stain Scheme ..... 35**

**D. Defendants' Unsupervised Radiation Scheme ..... 37**

**VIII. COUNTS ..... 42**

**COUNT ONE Violations of Federal False Claims Act 31 U.S.C. § 3729(a)(1)(A) False Claims for "Incident-to" Dermatology Services Rendered by Physician Assistants ..... 42**

**COUNT TWO Violations of Federal False Claims Act 31 U.S.C. § 3729(a)(1)(A) False Claims for Dermatology Services Rendered by Physician Assistants In Violation of State Law Supervision Requirements ..... 43**

**COUNT THREE Violations of Federal False Claims Act 31 U.S.C. § 3729(a)(1)(A) False Claims for Complex Would Repair Services Not Actually Provided ..... 44**

**COUNT FOUR Violations of Federal False Claims Act 31 U.S.C. § 3729(a)(1)(A) False Claims for Medically Unnecessary IHC Stains ..... 45**

**COUNT FIVE Violations of Federal False Claims Act 31 U.S.C. § 3729(a)(1)(A) False Claims for Unsupervised Radiation Therapy ..... 46**

**COUNT SIX Violations of False Claims Act, 31 U.S.C. § 3729(a)(1)(B) Falsification of Medical Records and Lab Billing Records in Support of False Claims .................. 47**

**COUNT SEVEN Violations of False Claims Act, 31 U.S.C. § 3729(a)(1)(G) Improper Retention of Government Plan Overpayment / Reverse False Claim ....... 47**

**COUNT EIGHT Violation of the Michigan Medicaid False Claims Act, 31 U.S.C. § 3729(a)(1)(G) False Claims for Dermatology Services Not Actually Provided or Not Medically Necessary ........................................................................................ 48**

**IX. PRAYER FOR RELIEF ........................................................................................ 49**

NOW COMES Relator Colleen Van Egeren through her attorneys, Cross Law Firm, S.C., by Nola J. Hitchcock Cross and Mary C. Flanner, and states that this is an action brought on behalf of the United States of America and the State of Michigan against **The New Dermatology Group Ltd.** and its owner **Kevan G. Lewis**, MD, pursuant to the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA") and Michigan Medicaid False Claims Act, MCLA §§ 400.601 ("MMFCA") for knowingly submitting or causing the submission of false claims for payment to the United States of America as well as the State of Wisconsin and State of Michigan's federally funded Medicaid programs. Relator also brings this action on behalf of herself to obtain a Relator share of the damages to the United States and the State of Michigan. As and for her allegations against Defendants, Relator Colleen Van Egeren states as follows:

## I. INTRODUCTION TO THE FRAUD

1. As the self-proclaimed "most accomplished Dermatologist in Northeast Wisconsin and Michigan's Upper Peninsula," Defendant dermatologist Kevan Lewis, MD owns and operates The New Dermatology Group ("NDG")—a large, regional dermatology practice with five (5) outpatient clinics.

2. Despite his representations and his five (5) clinics that span two states, Defendant Dr. Lewis is Defendant New Dermatology Group's **only** practicing dermatologist.

3. As described below, Defendant Lewis has grown Defendant NDG and maximized his own profits by flagrantly violating Medicare's "incident to" billing rules, which allow non-physician services rendered in an outpatient office to be billed to the Government under a Physician's name *only if* the services are rendered in compliance with specific supervision requirements and corresponding state law.

4. At all times relevant to this complaint, most dermatology services provided by Defendant NDG were rendered by a flock of recently graduated physician assistants:

Defendant Dr. Lewis




Source: [http://newdermgroup.com/](http://newdermgroup.com/) [accessed March 11, 2022].

5. Wisconsin law expressly limits the number of Physician Assistants a physician such as Defendant Lewis may supervise to "**[n]o…more than 4 on-duty physician assistants at any time** unless a written plan to do so has been submitted to and approved by the [state medical] board." Wis. Admin. Code § 8.10 (emphasis added).

6. On information and belief, Defendants have no supervision plan approved by a state or medical board.

7. Demonstrating his awareness of the strict supervision requirements, Defendant Dr. Lewis has concealed NDG's violation of the supervision regulation by falsely claiming that 82-year-old dermatologist Rene M. Earles, MD also provides supervision over physician assistants in the five (5) outpatient clinics operated by The New Dermatology Group.

8. Actually, Dr. Earles was not then and is not now a practicing dermatologist at all.

9. Dr. Earles did not and does not see NDG patients himself; he provided no supervision to any of the physician assistants; and his periodic presence in the Appleton NDG clinic primarily consisted of his sleeping, eating, writing poetry, socializing with office staff, and working on a book he said he was writing. He did not participate in the delivery of or supervision over the delivery of healthcare.

10. Further, Dr. Earls often did not come around at all, even to write his poetry or sleep, during various periods of illness or other medical situations. Yet even during stretches when Dr. Earles did not come around to any clinics at all due to medical reasons or otherwise, Defendant Lewis directed NDG's physician assistants to submit factually false claims under Dr. Earles' name.

11. In addition to this Incident-to Billing Scheme, Defendant NDG is engaged in other schemes to bilk health insurance, including federally funded health insurance plans such as Medicare and Medicaid, by:

a. Billing for certain "complex closures" after every "Mohs" surgical procedure, regardless of whether the closure was actually complex and supported by documentation in the Beneficiary's medical records, hereinafter the "***Complex Closure Upcoding Scheme***;"

b. Billing for medically unnecessary diagnostic immunohistochemical ("IHC") staining, hereinafter "***Unnecessary Pathology Stain Scheme;***"

c. Billing for superficial radiation therapy (SRT) provided by technicians with no physician in the building, hereinafter the ***Unsupervised Radiation Scheme***.

12. Since its founding in 2011-2012, Defendant NDG has grown exponentially. By 2020, Defendant NDG's Green Bay location alone provided services to approximately 120 patients *per day*.

13. Based on her experience and direct observation of Defendant NDG's patient population, Relator estimates that at least 40% of Defendant NDG's patients were Beneficiaries of Medicare, Medicaid, or other Government-funded health insurance plans or workers compensation coverage.

14. Defendant Lewis clearly understood that the above-described schemes constituted material violations of billing rules and conditions of payment, because his own billing staff as well as at least one private insurance company explained the billing requirements to him no later than October 2020.

15. Nonetheless, as of February 25, 2021, Defendant Lewis had taken no action to further identify or return the overpayments caused by Defendant NDG's false claims. Instead, Defendants Lewis and NDG have knowingly retained Government funds obtained through the submission of false claims, constituting their **Retained Fraudulent Funds Scheme**.

*16. Further, as set forth in detail below, Dr. Lewis' billing schemes have catapulted him to not only one of the top billing outliers in Wisconsin and Michigan, but also when compared to all other dermatologists throughout the United States.*

## II. STATEMENT OF THE CASE

17. This is an action to recover damages and civil penalties on behalf of the United States of America and State of Michigan arising from false and/or fraudulent statements, records, and claims made and caused to be made and failures to return funds received from the Government, by Defendants in violation of the FCA, 31 U.S.C. §§ 3729 *et seq.* and MMFCA, MCLA §§ 400.601 *et seq*.

18. Relator Colleen Van Egeren brings this *qui tam* action under seal on behalf of the United States of America for treble damages and civil penalties arising from Defendants' fraudulent conduct in violation of the Federal Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA") involving claims for dermatology services submitted to and paid by Government healthcare programs, including Medicare and Medicaid.

19. The allegations herein are based primarily on the direct and independent knowledge of Relator Colleen Van Egeren, a Physician Assistant employed by Defendants from January 5, 2015, to February 25, 2021.

20. As introduced in Section I above and described in detail below, from at least 2012 to the present and continuing, Defendants have engaged in and continue to engage in a scheme to present or cause to present false claims for payment to federal, Wisconsin (including the federal funds portion of Wisconsin coverage), and Michigan healthcare programs; knowingly certified false records in order to support fraudulent claims; and knowingly concealed obligations to repay and return federal healthcare program funds to which they are not entitled, all in connection with outpatient dermatology services.

## III. FEDERAL JURISDICTION AND VENUE

21. Acts and omissions prohibited by the False Claims Act, 31 U.S.C. §§ 3729 *et seq*. and set forth with particularity herein occurred throughout Wisconsin. Therefore, this court has jurisdiction over this case pursuant to 31 U.S.C. § 3732(a) as well as under 28 U.S.C. § 1345.

22. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) and (c) because Defendants transact business in this District and one or more of the acts committed by the Defendants and prohibited by 31 U.S.C. § 3729 occurred in this District.

23. Prior to filing, Relator provided notice of her intent to file this action to the Eastern District of Wisconsin's United States Attorney's Office.

## IV. PARTIES

### A. Relator

24. **Relator Colleen Van Egeren** is a citizen of the United States of America and a resident of the Village of Suamico, County of Brown, State of Wisconsin. During all relevant times she was a licensed Physician Assistant in the State of Wisconsin with specialized training

in dermatology, and she was employed as a Board-certified Physician Assistant by Defendant NDG from January 5, 2015 until February 25, 2021.

25. Relator Van Egeren brings this action based upon her independent and direct knowledge on behalf of the United States of America pursuant to 31 U.S.C. § 3730(b)(1), and on behalf of the State of Michigan, pursuant to MCL 400.601 *et seq.*.

**B. Government Plaintiffs**

26. The **United States of America** is a sovereign country whose Department of Health and Human Services ("HHS") through the Center for Medicare and Medicaid ("CMS") and other executive agencies pays claims submitted or caused to be submitted to it by Defendants through its healthcare programs including Medicare and, as shared with Wisconsin and Michigan, through the Medicaid Program, and other Government-funded healthcare plans such as, but not limited to, Tricare and federal employee workers compensation. Relator brings this action on behalf of the United States of America pursuant to 31 U.S.C. § 3730(b)(1).

27. Relator also brings this action on behalf of the **State of Michigan** pursuant to Michigan MCL 400.601 *et seq.* The State of Michigan, through its Department of Health and Human Services, pays claims caused to be submitted to it by Defendants through Michigan's Medicaid program.

**C. Corporate Defendants**

28. Defendant New Dermatology Group, Ltd. is a Wisconsin service corporation with its principal place of business located at 2221 S. Webster Avenue. #241, Green Bay, Wisconsin 54301, where its registered agent, Defendant Kevan G. Lewis, is also located.

**D. Individual Defendant**

29. Defendant Kevan G. Lewis , M.D. is a citizen of the United States of America and a resident of Outagamie, Wisconsin. He has been a physician licensed to practice medicine in Wisconsin since 2009 and the owner of Defendant The New Dermatology Group, Ltd., since 2012.

## V. LEGAL AUTHORITY

### A. The False Claims Act

30. The False Claims Act ("FCA") was originally enacted during the Civil War and is sometimes referred as the "Lincoln Law." Congress substantially amended the Act in 1986, 2009, and 2010, to enhance the ability of the United States to recover losses it sustained as a result of false claims, by further incentivizing Relators to file such claims on behalf of the United States.

31. In 1986, Congressional hearings found that false claims for payment in federal programs was pervasive and that the FCA is a primary tool for combating false claims to the government, whereupon Congress amended the Act with the intention of enhancing incentives for individuals with knowledge of false claims against the Government to disclose the information without fear of reprisals. *See generally*, *False Claims Act Amendments: Hearings before the Subcomm. of Admin. Law and Gov't Relations of the Comm. on the Judiciary*, 99th Cong. 48 (1986).

32. The current FCA is designed to encourage the private bar to commit legal resources to pursuing fraud on the Government's behalf and to create a private/public partnership to obtain recovery for false claims submitted to the Government. *See generally*, *False Claims Act*

*Amendments: Hearings before the Subcomm. of Admin. Law and Gov't Relations of the Comm. on the Judiciary*, 99th Cong. 48 (1986).

33. The FCA subjects a person to liability under section 31 U.S.C. §§ 3729 (a)(1) who, *inter alia*:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; … or …
>
> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

34. Under 31 U.S.C. § 3729 (b)(1), the "terms 'knowing' and 'knowingly'":

> (A) mean that a person, with respect to information—
>
> > (i) has actual knowledge of the information;
> >
> > (ii) acts in deliberate ignorance of the truth or falsity of the information; or
> >
> > (iii) acts in reckless disregard of the truth or falsity of the information; and
>
> (B) require no proof of specific intent to defraud.

35. Any person who violates the FCA *qui tam* provisions is liable for civil penalties for each violation and liable for three (3) times the amount of the damages sustained by the United States. 31 U.S.C. § 3729(a)(1).

| The current and adjusted per-claim civil penalties imposed under the False Claims act, per claim, pursuant to 28 C.F.R. § 85.5, are | **Minimum** | **Maximum** |
|---|---|---|

| and have been, depending on the date imposed, as follows: **FCA Civil Penalty - Effective Dates** | | |
|---|---|---|
| June 20, 2020 – | $11,665 | $23,331 |
| January 30, 2018 – June 19, 2020 | $11,181 | $22,363 |
| February 4, 2017 – January 29, 2018 | $10,957 | $21,916 |
| August 1, 2016 - February 3, 2017 | $10,781 | $21,563 |
| August 1999 - August 1, 2016 | $5,500 | $11,000 |
| 1986 - August 1999 | $5,000 | $10,000 |

*See* 28 C.F.R. § 85.5; 85 Fed. 37,004-10 (June 19, 2020).

## B. Medicare and Other Federal Healthcare Programs

36. Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq*., established the Health Insurance for the Aged and Disabled Program, commonly referred to as "Medicare." Pursuant to the Medicare program and other government healthcare programs described below, the government pays claims for reasonable *and* necessary healthcare provided to its Beneficiaries.

37. Medicare has multiple parts:

a. Medicare Part A, the Basic Plan of Hospital Insurance, covers the cost of inpatient hospital services, hospice services, and related care.

b. Medicare Part B, the Voluntary Supplemental Insurance Plan, covers the cost of physicians' services and outpatient diagnostic tests.

c. Medicare Part C, the Medicare Advantage program, covers both Part B and C and can cover additional services through plans administered by private insurance companies.

d. Medicare Part D, the Medicare Prescription Drug Benefit, at issue herein, covers the costs of prescription drugs and is also available as part of Part C Medicare Advantage plans.

38. The United States Department of Health and Human Services ("HHS") is responsible for the administration and supervision of Government healthcare plans and its Center for Medicare and Medicaid Services ("CMS") is directly responsible for program oversight.

39. To bill Medicare Part B, a provider must submit a paper form or its electronic equivalent to its regional Medicare Administrative Contractor ("MAC").

40. A MAC, or Medicare Administrative Contractor, is a private health care insurer that CMS has awarded a geographic jurisdiction to process Medicare claims. Generally, pursuant to rules promulgated under the 2001 Administrative Simplification Act, claims must be submitted electronically unless certain exceptions are met, in accordance with CSM, Medicare Claims Processing Manual, ch. 1, § 02.

41. The type of claim form required to be submitted depends on the type of provider submitting the claim. Generally, institutional providers submit 837I, or its paper equivalent, CMS 1450, also known as UB-04, while claims for the services of individual health care professionals are submitted using 837P, or its paper equivalent CMS 1500, formerly known as HCFA 1500. These forms describe, among other things, the provider, the Patient Beneficiary, the referring physician, the service(s) provided by procedure code, the related diagnosis code(s), the dates of service, and the amount charged.

42. Providers submit forms 837I or CMS 1450 and thereby certify that the information provided is "true, accurate and complete" and that the specific services billed on

the form are "medically indicated and necessary" for the specific Patient Beneficiary involved.

43. Likewise, providers submitting forms 837P or CMS 1500 certify that "[s]ubmission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate, and complete."

44. At all times relevant to this action, Defendants were participating Medicare providers, and the local carriers that reviewed and approved the claims at issue in this case based their approval on their review of the enrollment and claim information provided by Defendants and relied on the veracity of those claims submissions when determining the material factors involved in the decision of whether to pay such claims.

45. Generally, claims submitted as described above for dermatology services are paid according to the Medicare Physician Fee Schedule ("PFS") established by CMS. 42 C.F.R. § 414.4

46. Since 1983, CMS has adopted the Current Procedural Terminology ("CPT") coding system as part of the Healthcare Common Procedure Coding System ("HCPCS") and mandated that physicians use this system to bill Medicare for their services. 42 C.F.R. § 162.1002.

47. CPT codes are a systematic listing of procedures and services performed by healthcare providers and are used to describe and evaluate the services claimed for payment, with each code defined by the American Medical Association's regularly updated *CPT Professional Codebook*.

48. The Federal Government administers other health care programs including, but not limited to, TRICARE/CHAMPUS, CHAMPVA, Medicaid, and federal workers'

compensation programs, all of which have the same material condition of payment as Medicare and all of which have thus been defrauded by Defendants' schemes.

49. TRICARE/CHAMPUS, administered by the United States Department of Defense, is a health care program for individuals and dependents affiliated with the United States armed forces. 10 U.S.C. §§ 1071 *et seq*.; 32 C.F.R. § 199.4(a).

50. CHAMPVA, administered by the United States Department of Veterans Affairs, is a health care program for the families of veterans with 100 percent service-connected disability. 38 U.S.C. §§ 1781 *et seq*.; 38 C.F.R. § 17.270(a).

51. The Medicaid Program, administered by individual states and jointly funded by State and Federal taxpayer revenue, is a health insurance program also created as part of the Social Security Act, 42 U.S.C. §§ 1396-1396v.

52. The Federal Employees' Compensation Act provides workers' compensation coverage, including coverage of medical care received due to a workplace injury or illness, to federal and postal employees. The Act is administered by the Department of Labor, Division of Federal Employees' Compensation. 5 U.S.C. §§ 8101 *et seq*.; 20 C.F.R. §§ 10.0 *et seq*.

**1. Medicare Payment for Physician Assistant "Incident-to" Services**

53. Medicare Part B covers physician assistants' services *only if* the following conditions are met:

(1) The services would be covered as physicians' services if furnished by a physician (a doctor of medicine or osteopathy, as set forth in section 1861(r)(1) of the Act)

and

(2) The physician assistant -

(i) Meets the qualifications set forth in paragraph (c) of this section;

(ii) Is legally authorized to perform the services in the State in which they are performed;

(iii) Performs services that are not otherwise precluded from coverage because of a statutory exclusion;

(iv) Performs the services in accordance with state law and state scope of practice rules for physician assistants in the state in which the physician assistant's professional services are furnished. Any state laws and scope of practice rules that describe the required practice relationship between physicians and physician assistants, including explicit supervisory or collaborative practice requirements, describe a form of supervision for purposes of section 1861(s)(2)(K)(i) of the Act. For states with no explicit state law and scope of practice rules regarding physician supervision of physician assistant's services, physician supervision is a process in which a physician assistant has a working relationship with one or more physicians to supervise the delivery of their health care services. Such physician supervision is evidenced by documenting at the practice level the physician assistant's scope of practice and the working relationships the physician assistant has with the supervising physician/s when furnishing professional service.

42 C.F.R. § 410.74.

54. In limited circumstances, Medicare allows physicians to submit claims for services rendered by employees of the physician "incident to" professional services rendered by the physician. 42 C.F.R. § 410.26(b)(5).

55. Since 2002, Medicare regulations have explicitly stated that Medicare will only pay for services "incident to the services of a physician" so long as the services are provided under the "direct supervision" of the physician. 42 C.F.R. § 410.26(b)(5).

56. Medicare expressly defines "direct supervision" as requiring that the physician "be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure." 42 C.F.R. § 410.32(b)(3)(iii).

57. Thus, Medicare "incident-to" billing rules prohibit billing for services under the National Provider Identification ("NPI") number of a physician who was not present in the office at the time the alleged supervision took place.

58. To qualify as "incident to," services must be part of a patient's normal course of treatment, during which the physician personally performed an initial service and remained actively involved during the treatment. Although the physician does not have to be physically present in the patient's treatment room itself while the services are provided, the services must be rendered under the direct supervision of the physician.

59. If the physician does not directly supervise their employee services, and the services were otherwise performed following applicable rules, such as state law supervision requirements, the claim for payment for the services must be submitted using the provider number of the non-physician practitioner to identify the performing provider, and payment is made in a reduced amount.

60. "Nurse practitioners, clinical nurse specialists, and physician assistants receive no more than 85 percent of the physician fee schedule amount for the service." 42 C.F.R. §§ 405.520(a), 414.52, 414.56.

61. In Wisconsin, a physician may supervise "[n]o…more than 4 on-duty physician assistants at any time unless a written plan to do so has been submitted to and approved by the [state medical] board." Wis. Admin. Code § 8.10 (emphasis added).

62. When submitting claims for payment, healthcare providers expressly certify compliance with the incident-to rules, as the standard Medicare claim form requires providers to certify that the billed services "were personally furnished by me or were furnished incident to my professional services by an employee under my immediate personal supervision."

63. Thus, to the extent a physician is not present as required, yet bills Medicare for a service purportedly provided incident to the services of a physician, the claim violates material Medicare regulations and is false.

64. Indeed, on January 24, 2020, the United States Department of Justice announced a $285,000 settlement with a an individual family medicine practitioner accused of violating Medicare's incident-to billing rules by "improperly charging government health care programs the physician's rate for services that were provided by nurse practitioners." U.S. Attorney's Office for the Eastern District of Tennessee, https://www.justice.gov/usao-edtn/pr/family-physician-pays-285000-settle-false-claims-act-allegations-billing-services.

65. At all times relevant to this complaint, Defendants NDG and Lewis were aware of the incident-to billing rules and Wisconsin's PA supervision regulations as well as the fact that compliance with each was required as a pre-condition for eligibility for payment from Government funded healthcare plans like Medicare and Medicaid.

### 2. Medicaid Payment for Dermatology Services

66. Medicaid is a public assistance program providing for payment of medical expenses for the poor and disabled. Wisconsin Medicaid covers physician services, including dermatology services.

67. To be eligible for Medicaid payment, dermatology services "performed under the supervision of a physician shall comply with federal and state regulations relating to supervision of covered services." Wis. Admin Code. DHS § 107.06(4)(f).

68. Further, to be eligible for Medicaid payment, dermatology services "performed under the supervision of a physician" must be supported by "[s]pecific documentation of the services…in the recipient's medical record." Wis. Admin Code. DHS § 107.06(4)(f).

69. Funding for Medicaid is shared between the federal and state governments. The federal Medicaid program is administered by the federal Centers for Medicare and Medicaid Services ("CMS"), formerly the Health Care Financing Administration ("HCFA"). Each state administers its own Medicaid program, although the federal Medicaid statute sets forth the minimum requirements that each state must follow to qualify for federal funding.

70. Wisconsin Medicaid also requires compliance with Medicare's "incident to" billing as a material condition of payment. For example, Molina Healthcare's 2022 Provider Manual for Wisconsin Medicaid plans specifically lists, at pages 59 and 60, "not following incident to billing guidelines in order to receive or maximize reimbursement" in its list of "Examples of Fraud, Waste, and Abuse by a Provider." https://www.molinahealthcare.com/-/media/Molina/PublicWebsite/PDF/Providers/wi/Medicaid/manual/WI_Medicaid_ProviderManual_2022_R.pdf .

71. Although Michigan has more relaxed Physician Assistant supervision regulations which allow them to practice pursuant to a "practice agreement" with a physician who is neither

required to be present nor limited in the specific number of Physician Assistants they may supervise under such an agreement, on information and belief, Michigan Medicaid's "incident-to" billing requirements still incorporate Medicare's requirement for direct supervision in order for a physician assistant's services to be billed at 100% of the physician's fee schedule rate.

72. In any case, the medical records must factually support the actual healthcare services provided---not ask the records so that Defendants can obtain government payment for physician services that were not actually provided to the Patient Beneficiaries.

## VI. FACTUAL BACKGROUND

### A. Relator Colleen Van Egeren

73. Relator Van Egeren earned her Master's degree in Physician Assistant studies from Rosalind Franklin University in North Chicago, Illinois, in 2007 and completed additional, specialized dermatology education and training at the Dermatology Institute of DuPage Medical Group in Naperville, Illinois.

74. From 2007 to 2014, Relator was employed as a licensed Physician Assistant specializing in dermatology with a local dermatology practice in the Green Bay, Wisconsin area, during which time she became familiar with the rules and regulations governing Physician Assistant supervision requirements and Medicare's "incident-to" billing rules.

75. In January 2015, Relator commenced employment as a Physician Assistant ("PA") with Defendant NDG, working under Defendant Lewis, primarily at NDG's Bellevue, Wisconsin clinic.

76. Throughout her employment with Defendant NDG, Relator, in the regular course of performing her duties as a PA, observed and utilized Defendant dermatology-specific medical

record and billing system, EMA, which included detailed information regarding the submission of claims for payment, patients' insurance information, and patients' medical records.

77. In addition, Relator's knowledge regarding Defendants' schemes is also based on her own direct observation of Defendant Lewis and Dr. Earles' respective presence and absence in the NDG clinics, as well as communications with her fellow physician assistants and Defendants' administrative staff, including Defendants' longtime billing supervisor, Wendy Justus.

## B. Defendant NDG's Organizational and Operational Structure

78. Incorporated in 2012, Defendant The New Dermatology Group ("NDG") is a dermatology practice owned and controlled by Defendant Lewis.

79. Defendant NDG provides a wide variety of dermatology services from treatments for various benign skin conditions, such as warts, acne, and wrinkles, to skin cancer treatment and complex surgical procedures.

80. Since its incorporation, NDG has been headquartered at its clinic location in Green Bay, Wisconsin, at 141 Siegler Street, near St. Mary's Hospital.

81. At all relevant times, Defendant NDG has provided dermatology services at clinics, located at:

141 Siegler Street
Green Bay, Wisconsin

3059 Voyager Drive
Bellevue, Wisconsin

2500 E. Capitol Drive
Appleton, Wisconsin

1606 S. Stephenson Ave.
Iron Mountain, Michigan

610 S. Lincoln Road
Escanaba, Michigan

82. Currently, Defendant NDG employs fourteen (14) physician assistants to staff the five clinics.

83. At all times relevant to this complaint, at least half of Defendant NDG's physician assistants had five (5) or fewer years of medical experience and several had only recently graduated as physician assistants.

84. The fourteen (14) physician assistants currently employed by Defendant NDG are:

**Katelyn Mceachen**, a 2021 graduate;

Stephanie Paape, a 2021 graduate (unlisted);

**Rachel Sobek**, a 2021 graduate;

Joshua Hickman, a 2020 graduate (unlisted);

**Mathew Rand**, a 2019 graduate;

**Danielle Gemigani**, a 2018 graduate;

David E. Orr, a 2017 graduate;

**Joshua Hulkonen**, a 2016 graduate, licensed in 2021;

**Ramona Hulkonen**, a 2016 graduate;

**Tara Becher**, a 2014 graduate licensed in 2021;

**Michael Beauchaine**, a 2014 graduate, licensed in 2017;

**Katherine Vils**, a 2013 graduate;

**Jason O. Davis**, a 2013 graduate; and

Laura Stebnitz, a 2010 graduate.

85. Of these fourteen physician assistants, Defendant Lewis currently claims to be the "MD Supervisor," for Wisconsin licensing and regulatory purposes, of at least the **ten (10)** of the physician assistance, as indicated by the bold type in the preceding paragraph.

86. Of these ten physician assistants for whom Defendant Lewis claims to be providing the legally required supervision, at least two (2) of them—Joshua and Ramona Hulkonen—practice primarily in Defendant NDG's two Upper-Michigan locations, in Iron Mountain, Michigan and/or Escanaba, Michigan, whereas the other seven (8) practice exclusively or primarily in Defendant NDG's Green Bay, Wisconsin area locations.

87. On the State of Wisconsin Department of Safety & Professional Services ("DPS") website, https://licensesearch.wi.gov/ , Dermatologist Rene M. Earles, MD is listed as the physician supervisor solely for physician assistant David. E. Orr.

88. Dr. Earles previously claimed on the Wisconsin Department of Safety & Professional Services ("DPS") website, https://licensesearch.wi.gov/ , to be the physician supervisor for Katheryn Vils from May 20, 2017 until January 20, 2022, when Dr. Lewis became her listed supervisor; and for Ramona Hulkonen from April 22, 2019 until February 20, 2020, when Dr. Lewis also became her listed supervisor.

89. As described in further detail below, Dr. Earles is not an owner, officer, or even regular employee of, or independent contractor affiliated with, Defendant NDG.

90. Defendant NDG's website correctly omits Dr. Earles from its website. He is not listed as one of the NDG's providers on the NDG website.

91. Rather, Dr. Earles' only role with NDG is as another physician whose name and NPI number Defendant NDG uses to further its fraudulent scheme to submit false claims for

services rendered by physician assistants, as if they were provided "incident to" Dr. Earles' services when, in fact, such services were provided independently by a physician assistant.

92. Additionally, Defendants used Dr. Earles' name and NPI to submit false claims for Superficial Radiation Therapy ("SRT") which were actually provided by Technicians, in violation of Wisconsin law.

93. On information and belief, to continue to falsely use his name and NPI number in furtherance of their fraudulent schemes, Defendants provide Dr. Earles various forms of compensation. For example, Defendant Lewis owns the home where Dr. Earles resides and allows Dr. Earles to live there for free or reduced rent.

94. In addition to the flock of physician assistants, Defendant NDG employs administrative staff, such as Executive Assistant Joseph Reed, front desk workers, and about five "call center" employees who responsible for managing incoming calls from patients and scheduling appointments.

95. Defendant NDG's administrative staff also included billing supervisor Wendy Justus, until her resignation in late 2020 amidst Defendant Lewis's escalation of his fraudulent incident-to billing scheme.

96. From 2017 to 2021, Defendants use EMA®, a cloud-based, "all-in-one," electronic health record (EHR) system specifically designed for dermatology practices, which integrates medical records, practice management, billing, and other functions.

97. Using information and settings provided by or determined by Defendants NDG and Lewis, the EMA software autogenerates and automatically assigns billing codes based on the providers' notes. Prior to 2017 and beginning again in 2021, Defendants used Athena Health's HER and billing software.

98. Since its founding in 2012, Defendant NDG and Defendant Lewis' practice has grown exponentially, with Defendant Lewis seeing anywhere from 25 to 60 patients per day.

## VII. DEFENDANTS' FRAUDULENT CONDUCT AND FALSE CLAIMS

### A. Defendants' "Incident-to-Billing" & Unsupervised PA Scheme

99. Throughout Relator's employment at Defendant NDG, she witnessed extreme turnover, with over seventy (70) employees coming and going.

100. Throughout Relator's employment at Defendant NDG, she also witnessed Defendant Lewis' utter disregard for billing requirements and disregard for veracity in billing and supporting documents, specifically related to which healthcare provider *actually* provided the healthcare services and whether they had actually been performed "incident to" supervision.

101. In August 2020, one of Relator's physician assistant colleagues, Megan Hotchkiss, gave Defendant Lewis eight weeks' notice of her intent to resign her employment with Defendant NDG.

102. In response, in August 2020, Defendant Lewis asked Relator to convince Hotchkiss to rescind her resignation. During this conversation, Lewis also told Relator that he knew Hotchkiss was going through a divorce and that if she stayed, he could help her "hide her assets."

103. In October 2020, Defendant NDG hired a new physician assistant, Stacy Rosevear, to partially replace Hotchkiss by working on a part-time *locum tenens* basis.

104. At the time NDG hired her and she began billing government healthcare programs for healthcare services through NDG, Rosevear did not have Medicare billing credentials.

105. Thus, before Hotchkiss discontinued her employment with Defendant NDG in October 2020, Defendant Lewis directed physician assistant Hotchkiss to have Rosevear submit claims for payment for her services using Hotchkiss' NPI number.

106. Around the same time, Defendant Lewis also directed NDG physician assistant Katie Vils to have Rosevear submit claims for payment for Vils' services, using Hotchkiss' NPI number.

107. Both Hotckkiss and Vills refused Defendant Lewis' directive and declined to allow Rosevear to use their NPI numbers, telling Defendant Lewis that doing so would be unlawful.

108. Thereafter, Defendant Lewis instead directed Defendant NDG administrator Joseph Reed, Lewis' Executive Assistant, to bill all of Rosevear's office visits under Dr. Rene Earles' NPI number, including those subsequently submitted to government healthcare plans for payment.

109. However, at the time from October 2020 through the end of 2020, Dr. Earles was had a medical matter that eliminated his ability to even visit the Appleton or other NDG clinics to sleep or write poetry. During that period, Dr. Earles was never even present at any of Defendants' clinics.

110. Nonetheless, Defendant NDG and Defendant Lewis submitted and caused the submission of false claims for dermatology services rendered "incident-to" services that Dr. Earles did not, and could not, provide because Dr. Earles was not present.

111. Shortly thereafter, Defendant NDG's billing supervisor called Relator, distraught, and explained to Relator Defendant Lewis' scheme to use Defendant Earles' NPI numbers to support "incident-to" billing when, in fact, Dr. Earles was not even present during this period.

112. Throughout Relator's employment with Defendant NDG, Dr. Earles would often stop by a clinic, apparently for social reasons and somewhere to go, but he was neither scheduled to see any patients nor acting in any supervisory capacity.

113. Initially, beginning in or about 2017, Dr. Earles, at Defendant Lewis's direction, would appear on an almost daily basis at Defendant NDG's Appleton, Wisconsin clinic for the sole purpose of Dr. Lewis being able to provide a plausible cover for facilitating fraudulent "incident-to" billing.

114. Specifically, at Defendant Lewis's direction, NDG's Physician Assistants, including Relator, would ask Dr. Earles to come say "hello" to their patient. The interactions would last only a few seconds, involved no review of medical records or any discussion of the patients' concerns or the physician assistant's findings or recommendations, and Dr. Earles had no role in or even a discussion or understanding about the diagnosis or treatment of the patients whatsoever.

115. After Dr. Earles would say "hello" to a patient and physician assistant, he would return to his office, where he would sleep, eat, write poetry, socialize with office staff, and work on the book he was writing.

116. Even when Dr. Earles was able to get out of his house and stop by the NDG Appleton clinic to sleep or eat, and perform other person functions, Dr. Earles had no schedule of which days he might show up in the clinic or what hours he would come in or leave from the Appleton clinic.

117. Throughout the relevant period, Dr. Earles was present, intermittently, but with

frequent, multi-week and multi-month absences, during all of which, Defendant NDG, at Defendant Lewis' direction, submitted claims under Dr. Earles' name and NPI number for dermatology services provided by Physician Assistants.

118. Defendant Lewis told Relator and other physician assistants that Dr. Earles briefly saying "hello" to the client was necessary and sufficient to support "incident-to" billing at 100% of the physician fee rate --- although apparently this was not actually necessary in Dr. Lewis' view for the highest level of billing, when Dr. Earles was totally absent and not able to provide even the façade or supervision.

119. Then, in or about 2019, Defendant Earles collapsed while at NDG's Appleton clinic. Thereafter, he was present only intermittently, with frequent, multi-week and multi-month absences, during which Defendant NDG, at Defendant Lewis' direction, continued to submit claims under Dr. Earles' name and NPI number for dermatology services provided by physician assistants even without a dermatologist even present in the relevant clinic.

120. Indeed, throughout most of 2020, Dr. Earles did not even appear at an NDG clinic due to his expressed concerns about the COVID pandemic.

121. For example, Defendants caused the claims for dermatology services rendered by physician assistant Stacy Rosevear in October, November, and December as "incident-to" services using Dr. Earles' name and NPI, despite the fact that, at the time these Beneficiaries received the services, Dr. Earles was not even present in the building.

122. Defendants' incident-to billing and unsupervised physician assistant Scheme has cost the Government millions of dollars in payments of false claims since Defendant NDG initiated its business in 2012.

123. Because Defendants also violated Wisconsin law and made false representations

to the government regarding physician assistant supervision, the direct harm to the Government is not limited to the 15% difference between the incident-to physician fee rate and the lower physician assistant rate.

124. Rather, had Medicare or Medicaid known that the services of physician assistants employed by Defendant NDG since 2012 were rendered in violation of Wisconsin's supervision requirements, the claims for payment for those services would not have been paid, because physician assistant services can only be directly billed to and paid for by Medicare if rendered in compliance with "state law and state scope of practice rules for physician assistants in the state in which the physician assistant's professional services are furnished." 42 C.F.R. § 410.74(a)(2)(iv).

### B. Defendants' Complex Closure Upcoding Scheme

125. Defendant NDG billing supervisor Wendy Justus also informed Relator that Defendant Lewis was engaged in other fraudulent billing schemes, including the submission of false, "up-coded" claims for "complex closures" of wounds in connection with his performance of Mohs Micrographic Surgery, a precise surgical technique used to treat certain kinds of skin cancer.

126. Abbreviated "MMM" or "Mohs," the Mohs Micrographic Surgery surgical technique is named after its inventor, surgeon Fredrick E. Mohs.

127. As explained by CMS, Mohs surgery is performed for the removal of complex or ill-defined skin cancer and refers to "a precise tissue-sparing, microscopically-controlled surgical technique used in the removal and treatment of selected malignant neoplasms of the skin." CMS, *Medicare Coverage Database: Billing and Coding: Mohs Micrographic Surgery (MMS),*

A57767, Oct. 3, 2018, https://www.cms.gov/medicare-coverage-database/view/article.aspx?articleId=57767&ver=3.

128. Mohs surgery "aims to achieve the highest possible cure rates, and minimize wound size and consequent distortions at critical sites such as the eyes, ears, nose, and lips." *Id.*

129. Mohs surgery includes "a two-step process in which: (1) the tumor is removed in stages, followed by immediate histologic evaluation of the margins of the specimen(s), and (2) additional excision and evaluation is performed until all margins are clear." *Id.*

130. Mohs surgery leaves an open wound, which most often is reconstructed (or "closed") by the Mohs surgeon. *Id.*

131. Thus, while "[s]ome wound management is included in the intra and post service work of the Mohs surgery codes," the Mohs surgeon also "has the option" of using repair, meaning closure, codes as appropriate. *Id.*

132. "Per the CPT codebook, if repair / closure is performed, the Mohs surgeon may report separate repair, adjacent tissue transfer or rearrangement, flap, or graft codes. The guidelines at the beginning of applicable sections of the CPT codebook define items that are necessary to report services and procedures." *Id.*

133. For billing and documentation purposes, Mohs surgery wound repair is classified as "simple, intermediate, or complex, which are described by Medicare coding guidelines as follows:

> **Simple repair** is used when the wound is superficial, e.g., involving primarily epidermis or dermis or subcutaneous tissue without significant involvement of deeper structures and requires a simple one-layer closure.

**Intermediate repair** includes the repair of wounds that, in addition to the above, required layered closure of one or more of the deeper layers of subcutaneous tissue and superficial (non-muscle) fascia, in addition to the skin (epidermal and dermal closure).

**Complex repair** includes the repair of wounds requiring more than layered closure, viz., scar revision, debridement, extensive, undermining, stents or retention sutures.

*Id.*

134. In addition to Mohs surgeries, Defendant Lewis also performed various other "excision" surgeries, which also resulted in wounds that required one of the above levels of repair or "closure."

135. Categorized based on the part of the body involved and the size of the repair, the CPT codes for complex closures include:

**13101** - repair, complex, trunk; 2.6 cm to 7.5 cm;

**13121** - repair, complex, scalp, arms, and/or legs; 2.6 cm to 7.5 cm;

**13151** - repair, complex, eyelids, nose, ears, and/or lips; 1.1 to 2.5 cm;

**13131** - repair, complex, forehead, cheeks, chin, mouth, neck, axillae, genitalia, hands and/or feet; 1.1 cm to 2.5 cm; and

**13132 -** repair, complex, forehead, cheeks, chin, mouth, neck, axillae, genitalia, hands and/or feet; 2.6 cm to 7.5 cm;

136. Performing Mohs surgeries was a major part of Defendant Lewis' practice, and when the surgery was complete, he typically delegated the closure procedure to a physician assistant.

137. According to Justus and Relator's information and belief, Defendant Lewis

knowingly bills **all** of his closures as "complex closures," using the above CPT codes, even when he knew full well that the closures he performed did not meet Medicare's definition of "complex" and/or were not supported by the corresponding operative report and documentation.

138. Even in 2019 after being warned and "flagged" by the nation's largest third-party insurance claims administrator, United Medical Resources, which is owned by private insurance company United Healthcare, Defendant Lewis continued to bill his Mohs closures using the above "complex" codes to government healthcare plans, according to Defendant NDG's Billing Supervisor Wendy Justus and Relator's information and belief.

139. Justus also informed Relator that Defendant Lewis' Mohs documentation frequently supported only the use of an intermediate closure code, *which would have resulted in substantially lower Medicare payments than the above complex closure codes*.

140. For example, Medicare pays up to $446.43 for a complex closure of a wound on the eyelids, nose, ears or lips, CPT Code 13151, and up to $300.75 for an intermediate closure of a wound on the same body parts, CPT code 12051.

141. The information Relator obtained from Defendant NDG's Billing Supervisor regarding Defendants' scheme to submit false claims for upcoded complex closures is consistent with data regarding Defendant Lewis' 2019 Medicare claims.

142. Specifically, in 2019 Defendant Lewis submitted 278 claims for payment to Medicare for complex closures under CPT Code 13132, purportedly for closure of complex, relatively large wounds on the forehead, cheeks, chin, mouth, neck, axillae, genitalia, hands and/or feet for 239 individual Medicare beneficiaries.

143. **Thus, in 2019, Defendant Lewis submitted more Medicare claims for CPT**

**Code 13132 than 95% of dermatologists nationwide and more than any other dermatologist in the state of Wisconsin.**

144. **Similarly, in 2019, Defendant Lewis submitted more Medicare claims for Complex closure CPT codes 13101 and 13121 than any other dermatologist in Wisconsin and more than 94% and 96% of dermatologists nationwide.**

145. Defendant Lewis's status as an outlier with regard to his use of complex closure CPT codes is even more pronounced because many Mohs surgeons focus more exclusively on Mohs surgery, dedicating 4-5 days per week to procedures, whereas Defendant Lewis generally spent just 2 days per week performing clinical work, plus additional time performing his own diagnostic dermopathology.

146. Neither Wisconsin nor Michigan are known for their high incidence of melanoma. Indeed, CDC data and epidemiological studies indicate that *Wisconsin has fewer cases of skin cancer than all but 14 states*.

147. Thus, Defendant Lewis' status as an outlier for Mohs surgeries and complex Closure underscores the extent of his fraudulent conduct. *See, e.g.*, Islami et al*, Cutaneous melanomas attributable to ultraviolet radiation exposure by state*, INT'L J. CANCER, 147, 1385–1390 (2020), https://onlinelibrary.wiley.com/doi/pdf/10.1002/ijc.32921.

### C. Defendants' Medically Unnecessary Stain Scheme

148. In the same conversation in which she informed Relator of Defendants' Complex Closure Upcoding Scheme, Defendant NDG's Billing Supervisor also explained to Relator that Defendant Lewis was performing medically unnecessary immunohistochemical "IHC" staining,

a special kind of antibody testing used to detect the presence of specific protein markers and assist with accurate tumor classification and diagnosis.

149. While the CPT codes for Mohs surgeries, CPT 17311 – 17315, generally include routine staining as part of the procedure, occasionally, a patient may require "additional single antibody stain on a slide or slides prepared from the same patient specimen as the initial antibody stain, such as tumor tissue," which are billed using CPT Codes **88341** and **88342**.

150. This additional single antibody stain is a relatively unusual procedure, which results in higher billing to government healthcare plans. However, Defendant Lewis was requiring such staining on a routine basis, untethered to medical necessity, but based instead solely on whether he could obtain payment for such staining.

151. Specifically, Billing Supervisor Wendy Justus informed Relator that Defendant Lewis would routinely call Justus and ask if a particular patient had met their deductible. Then, if Ms. Justus confirmed that the patient's deductible had been met, Defendant Lewis would perform and bill for the additional IHC staining under CPT 88341 and 88342.

152. However, in the same situation, if the patient's deductible had not been met, then Defendant Lewis would not perform or bill for the additional stains, out of concern that the patient would then ask for an explanation or documentation of the medical necessity of the additional testing, which Defendant Lewis knew he would not be able to provide.

153. In contrast, Dr. Lewis had no qualms about billing government healthcare plans for medically unnecessary services.

154. Thus, rather than exercising medical judgment and allowing medical necessity to

determine whether to perform the additional testing, Defendant Lewis' claims to Medicare for IHC testing billed under CPT codes 88341 and 88342 were based only on Defendant Lewis' desire to collect more payment from the Government.

155. Use of CPT codes 88341 and 88342 is relatively rare. In 2019 Defendant Lewis was one (1) of only eight (8) and thirteen (13) dermatologists in the State of Wisconsin to submit claims to Medicare with IHC staining codes 88341 and 88342, respectively.

156. In 2019, Defendant Lewis submitted 238 claims for IHC stains under CPT code 88342 performed for 204 different Medicare Beneficiaries—more claims than about 80% of all dermatologists who billed the code nationwide that year, a population that includes dermopathology practices dedicated exclusively performing and read stains.

### D. Defendants' Unsupervised Radiation Scheme

157. In addition to their systematic, deliberate failure to supervise their flock of Physician assistants in compliance with Medicare "incident-to" billing requirements and state law, Defendants NDG and Lewis also directed **unsupervised technicians** to perform Superficial Radiation Therapy ("SRT") on patients, including Medicare and Medicaid beneficiaries.

158. Defendant NDG, at the direction of Defendant Lewis, submits claims to Medicare and Medicaid for the Superficial Radiation Therapy (SRT) rendered by technicians using Dr. Earles' NPI number, falsely claiming that it was Dr. Earles who provided and/or oversaw the SRT.

159. The practice of indiscriminately assigning Dr. Earles' NPI number to false claims submitted for Superficial Radiation Therapy (SRT) work performed by technicians, was again particularly egregious given that Earles did not perform any healthcare services for NDG.

160. SRT is a non-surgical cancer treatment that kills non-melanoma skin cancer cells using focused, low-dose radiation, or X-rays.

161. The SRT procedure is performed in a clinical office setting. Patients typically receive two (2) treatments per week for eight (8) weeks. Each treatment takes only about 15 minutes.

162. The calibrated, targeted radiation used in SRT therapy is generated and applied using the SRT-100™, an FDA-approved device developed and sold by Sensus Healthcare:



163. Defendants purchased an SRT-100 device in or about October 2017 and have provided SRT at their Green Bay, Wisconsin office ever since.

164. Under Wisconsin law, only a physician who is "board certified in dermatology" or has completed "40 hours of instruction and 100 hours of supervised therapeutic work using x-ray units for the treatment of skin diseases" may provide SRT. Wis. Admin. Code DHS § 157.82(2)(b).

165. At all times relevant to this complaint, all claims submitted or caused to be submitted to Medicare, Medicaid, or other government-funded health programs by Defendants, were submitted under Dr. Rene M. Earles' NPI number.

166. Dr. Earles is neither a board-certified dermatologist nor has he undertaken the 40 hours of instruction and 100 hours of therapeutic experience alternatively required to provide SRT.

167. In 2019, for example, 569 claims were submitted to Medicare under Dr. Earles' name and NPI number for SRT CPT code 77280, for "management of radiation therapy, simple", along with 521 claims submitted to Medicare under SRT CPT code 77401, for radiation treatment delivery, simple, but no Medicare claims for SRT were submitted under Defendant Lewis' NPI number.

168. Yet, in the same year, Dr. Earles submitted claims to Medicare for only 31 established patient office visits.

169. On information and belief, Dr. Earles in fact saw no patients in office visits or otherwise. Thus, such billing under Dr. Earles' name for office visits would have been falsely submitted for office visits actually performed by physician assistants not yet approved for billing government healthcare plans.

170. In fact, Defendant NDG's Technicians, not Dr. Earles, often provide Defendant NDG's SRT services which Defendants caused to be falsely billed under Dr. Earles' name and NPI number.

171. Moreover, in 2020 and 2021, Dr. Earles was not even present in the Appleton clinic, let along in Green Bay, at the time of the majority of Defendant NDG's SRT treatments, which are provided exclusively in Defendant NGD's Green Bay, Wisconsin clinic.

172. For example, Defendant NDG submitted claims for payment to Medicare under Dr. Earles' name and NPI number for SRT services provided to **Beneficiary D.M**., who received seventeen (17) SRT treatments at NDG from September 2020 through December 2020.

173. Yet, as referenced above, Dr. Earles was home bound for medical reasons or in medical treatment from October 2020 through December 2020.

174. When Relator asked D.M. if D.M. had ever even met Defendant Lewis or Dr. Earles before or during any of D.M.'s SRT treatments, D.M. answered "no," which was consistent with Relator's information about the clinics' operations.

175. Moreover, as described above, Defendants also claimed that Dr. Earles was directly supervising physician assistant Stacy Rosevear from October 2020 until December 17, 2020, when Rosevear left NDG.

176. Critically, Rosevear provided dermatology services exclusively at Defendants' Appleton, Wisconsin clinic location.

177. Thus, by submitting claims under Dr. Earles' name for the "incident-to" services of Stacy Rosevear and SRT, Defendant NDG knowingly claimed that Dr. Earles was physically present **in two places at once**. In fact, he was at neither location.

178. In 2021, Dr. Lewis decided that instead of using Dr. Earles' NPI to falsely bill for

SRT, he would use an iPad to meet virtually with SRT patients using Facetime to skirt the law of having to push the button, apparently seeking to take advantage of certain waivers and exceptions implemented by CMS to address telehealth needs caused by the COVID-19 public health emergency.

179. However, no such waivers or exceptions applied to SRT, which can only be provided by a physician.

180. As explained by William Balke, the Radiation Safety Specialist Supervisor for the State of Wisconsin's Department of Health Services, state law requires a dermatologist to be physically present to "press the button" when providing SRT.

181. Moreover, Defendant NDG continued to provide SRT treatments even when Defendant Lewis was completely unavailable.

182. For example, from February 11 to February 26, 2021, Dr. Earles was not in the office and Defendant Lewis was out of the country and unable to be present or available for Facetime or any other kind of oversight. Nevertheless, Dr. Lewis continued his false billings.

183. Throughout the course of 2020 and 2021 Defendants provided and billed for SRT treatments to several patients at NDG's Green Bay clinic including **Medicare Beneficiaries W.A., G.T., K.K., and C.E**., using Defendant Earles' or Defendant Lewis' NPI even though neither were present for or involved in the treatment.

184. Indeed, Dr. Lewis, who has a heavy patient caseload and typically spends at least two full days per week performing surgical procedures, was routinely unavailable to provide or be present during any part of SRT. Instead, he left the SRT process entirely to technicians.

185. At Defendant Lewis' direction, SRT was provided exclusively by

Defendant NDG's technicians who not only lacked the required credentials but who also lacked any training beyond the few hours of cursory training provided by Sensus Healthcare regarding use of the SRT device.

186. The credential and training requirements for SRT are material to Medicare and Medicaid payment because they are critical to providing safe and effective SRT care and to avoid or reduce patient harm.

187. For example, while NDG's technicians may have been skilled at operating the SRT-100 machine, they are not dermatologists, and thus they are not trained to identify, assess, and diagnose skin conditions, some of which can be exacerbated if exposed to medically unnecessary SRT radiation.

188. Thus, Defendants' scheme inherently increases the risk of serious side effects and patient harm, including permanent skin damage and disfiguration caused by "skin breakdown," which can cause non-healing wounds and ulcers.

## VIII. COUNTS

### <u>COUNT ONE</u>

### Violations of Federal False Claims Act

### 31 U.S.C. § 3729(a)(1)(A)

### <u>False Claims for "Incident-to" Dermatology Services Rendered by Physician Assistants</u>

189. Relator realleges and incorporates by reference the allegations of all previous Paragraphs as if restated herein.

190. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*., as amended.

191. 31 U.S.C. § 3729(a)(1)(A) states that "any person who . . . knowingly presents, or Causes to be presented a false or fraudulent claim for payment or approval" is liable under the Act.

192. By engaging in the conduct set forth herein, Defendants have knowingly presented or caused to be presented for approval false or fraudulent claims for diagnostic laboratory services that were not reasonable or necessary, in violation of 31 U.S.C. § 3729(a)(1)(A).

193. The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

194. By reason of Defendants' acts, the United States has suffered substantial actual damages.

## COUNT TWO

### Violations of Federal False Claims Act

### 31 U.S.C. § 3729(a)(1)(A)

### False Claims for Dermatology Services Rendered by Physician Assistants In Violation of State Law Supervision Requirements

195. Relator realleges and incorporates by reference the allegations of all previous paragraphs as if restated herein.

196. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*., as amended.

197. 31 U.S.C. § 3729(a)(1)(A) states that "any person who . . . knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval" is liable under the Act.

198. By engaging in the conduct set forth herein, Defendants have knowingly

presented or caused to be presented for approval false or fraudulent claims for diagnostic laboratory services that were not reasonable or necessary, in violation of 31 U.S.C. § 3729(a)(1)(A).

199. The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

200. By reason of Defendants' acts, the United States has suffered substantial actual damages.

## COUNT THREE

**Violations of Federal False Claims Act**

**31 U.S.C. § 3729(a)(1)(A)**

**False Claims for Complex Would Repair Services Not Actually Provided**

201. Relator realleges and incorporates by reference the allegations of all previous paragraphs as if restated herein.

202. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*., as amended.

203. 31 U.S.C. § 3729(a)(1)(A) states that "any person who . . . knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval" is liable under the Act.

204. By engaging in the conduct set forth herein, Defendants have knowingly presented or caused to be presented for approval false or fraudulent claims for diagnostic laboratory services that were not reasonable or necessary, in violation of 31 U.S.C. § 3729(a)(1)(A).

205. The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

206. By reason of Defendants' acts, the United States has suffered substantial actual damages.

**<u>COUNT FOUR</u>**

**Violations of Federal False Claims Act**

**31 U.S.C. § 3729(a)(1)(A)**

**<u>False Claims for Medically Unnecessary IHC Stains</u>**

207. Relator realleges and incorporates by reference the allegations of all previous paragraphs as if restated herein.

208. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*., as amended.

209. 31 U.S.C. § 3729(a)(1)(A) states that "any person who . . . knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval" is liable under the Act.

210. By engaging in the conduct set forth herein, Defendants have knowingly presented or caused to be presented for approval false or fraudulent claims for diagnostic laboratory services that were not reasonable or necessary, in violation of 31 U.S.C. § 3729(a)(1)(A).

211. The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

212. By reason of Defendants' acts, the United States has suffered substantial actual damages.

## COUNT FIVE

**Violations of Federal False Claims Act**

**31 U.S.C. § 3729(a)(1)(A)**

**False Claims for Unsupervised Radiation Therapy**

213. Relator realleges and incorporates by reference the allegations of all previous paragraphs as if restated herein.

214. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*., as amended.

215. 31 U.S.C. § 3729(a)(1)(A) states that "any person who . . . knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval" is liable under the Act.

216. By engaging in the conduct set forth herein, Defendants have knowingly presented or caused to be presented for approval false or fraudulent claims for diagnostic laboratory services that were not reasonable or necessary, in violation of 31 U.S.C. § 3729(a)(1)(A).

217. The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

218. By reason of Defendants' acts, the United States has suffered substantial actual damages.

## <u>COUNT SIX</u>

### Violations of False Claims Act, 31 U.S.C. § 3729(a)(1)(B)

### <u>Falsification of Medical Records and Lab Billing Records in Support of False Claims</u>

219. Relator realleges and incorporates by reference the allegations of all previous paragraphs as if restated herein.

220. 31 U.S.C. § 3729(a)(1)(B) states that "any person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" is liable under the Act.

221. By engaging in the conduct set forth above, Defendants have knowingly made or used, or caused to be made or used, false or fraudulent records or statements material to false or fraudulent claims within the meaning of § 3729.

222. The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

223. By reason of Defendants' acts, the United States has suffered actual damages.

## <u>COUNT SEVEN</u>

### Violations of False Claims Act, 31 U.S.C. § 3729(a)(1)(G)

### <u>Improper Retention of Government Plan Overpayment / Reverse False Claim</u>

224. Relator realleges and incorporates by reference the allegations of all previous paragraphs as if restated herein.

225. 31 U.S.C. § 3729(a)(1)(G), imposes liability on any person who knowingly

makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

226. Defendants knew, by at least October 29, 2020, that Defendants had submitted or caused the submission of false claims for diagnostic clinical laboratory testing services and received overpayments from Medicare as result.

227. To date, Defendants have failed to return, or cause to be returned, the identified Government-funded overpayments that resulted from these false claims.

228. Through the acts described above, Defendants knowingly concealed money that was owed to the Government when Defendants failed to return to the Government payment received for medications which Defendants knew were not eligible for reimbursement under Medicare program or were overpayments.

229. By reason of Defendants' acts the United States has suffered actual damages.

## COUNT EIGHT

### Violation of the Michigan Medicaid False Claims Act, 31 U.S.C. § 3729(a)(1)(G)

### False Claims for Dermatology Services Not Actually Provided or Not Medically Necessary

230. Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

231. This is a claim for treble damages and civil penalties under the Michigan Medicaid False Claims Act, MCLA §§ 400.601 *et seq*.

232. By virtue of the misrepresentations and submissions of non-reimbursable claims

described above, Defendants knowingly presented or caused to be presented to the Michigan Medicaid Program false or fraudulent claims for payment or approval; and/or knowingly accomplished these unlawful acts by making, or causing to be made or used, a false record or statement; and/or conspired to present false or fraudulent claims for payment or approval.

233. The Michigan Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

234. By reason of these payments, the Michigan Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

## IX. PRAYER FOR RELIEF

WHEREFORE, Relator and the United States are entitled to damages from Defendants in accordance with the provisions of 31 U.S.C. §§ 3729-3733 and MCLS §§ 400.611 *et seq*, and Relator requests that judgment be entered against Defendants, including that:

a. Defendants cease and desist from violating the False Claims Act, 31 U.S.C. §§ 3729 *et seq.;*

b. Defendants pay an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty against Defendants of not less than $11,655 and not more than $23,331 for each violation of 31 U.S.C. § 3729 committed after November 2, 2015 pursuant to § 3729 (a)(1) and 28 C.F.R. § 85.5 or as may be further adjusted;

c. Relator be awarded 25% Relator share pursuant to 31 U.S.C. § 3730(d);

d. Relator be awarded a 25% Relator share pursuant to MCLS § 400.610(a)(9);

e. Relator be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d) and MCLS § 400.610(a)(9);

f. The United States and Relator be granted all such other relief as the Court deems just and proper.

**PLEASE TAKE NOTICE THAT THE PLAINTIFF/RELATOR DEMANDS THE ABOVE-ENTITLED ACTION TO BE TRIED TO A 12-PERSON JURY.**

Respectfully submitted and dated this 28th day of March 2022.

**Cross Law Firm, S.C.**
**Attorneys for Relator Colleen Van Egeren**

By:s/Nola J. Hitchcock Cross
Nola J. Hitchcock Cross
Bar Number: 1015817
Mary Flanner
Bar Number: 1013095

Nola J. Hitchcock Cros
Mary Flanner

**Cross Law Firm, S.C.**
845 North 11th Street
Milwaukee, WI 53233
Phone: (414) 224-0000
Fax: (414) 273-7055
Email: njhcross@crosslawfirm.com
mflanner@crosslawfirm.com