UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA, *ex rel.*
COLLEEN VAN EGEREN, et al.,

Plaintiffs,

Civil Action No. 22-CV-387

v.

THE NEW DERMATOLOGY GROUP, LTD., and
KEVAN G. LEWIS, M.D.,

Defendants.

---

**COMPLAINT-IN-INTERVENTION OF THE UNITED STATES OF AMERICA**

---

Plaintiff, the United States of America, alleges for its complaint-in-intervention as follows:

## Introduction

1. The United States brings this action against Defendants The New Dermatology Group, Ltd. ("NDG") and its owner, Dr. Kevan Lewis (collectively, "Defendants"), pursuant to the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, and the common law to recover nearly two million dollars of false billings Defendants submitted to Medicare from September 2017 through December 31, 2025 (the "relevant time").

2. NDG and Dr. Lewis provide dermatology treatment at clinics located in Northern Wisconsin and the Upper Peninsula of Michigan. For some patients with non-melanoma skin cancers, the Defendants treat those cancers with superficial radiation therapy ("SRT"). SRT is a non-surgical treatment that uses low-energy radiation to destroy non-melanoma skin cancers on or near the skin's surface.

3. A course of SRT typically involves several stages, starting with a diagnosis of cancer and prescription of SRT as the chosen treatment modality, followed by clinical treatment

planning to prepare for the delivery of SRT, and then the actual delivery of the radiation treatment and any follow-up care.

4. One clinical treatment planning service is called simulation, which the American Medical Association defines as the process of defining relevant normal and abnormal target anatomy and acquiring the images and data necessary to develop the optimal radiation treatment process for the patient. Simulation is a clinical treatment planning step, occurring prior to the actual delivery of SRT, in which the physician or other qualified provider develops the optimal radiation treatment for the patient.

5. Because it is a complex clinical planning service, Medicare typically paid $200 to $400 for each simulation during the relevant time.

6. After the simulation, patients at NDG typically returned to the office for 17 to 20 SRT treatment sessions over the course of several weeks to two months to receive the actual delivery of radiation to treat their skin cancers.

7. Because SRT treatment delivery involves low-energy radiation and a simple level of complexity, Medicare typically paid approximately $20 per treatment session during the relevant time.

8. To take advantage of the substantial reimbursement paid by Medicare for simulations, Defendants padded their claims to Medicare by billing for a simulation at each treatment session. Defendants did not actually provide a simulation at each SRT treatment session and, therefore, they falsely billed Medicare for services they did not render. To the extent Defendants did provide any simulations at the treatment sessions, moreover, such services were not reasonable and necessary for treatment.

9. Defendants knew that their claims to Medicare for these simulations were false. Indeed, Defendants received multiple warnings from medical coding consultants and private

insurance companies that they could not bill for a simulation for each SRT treatment session. Defendants nonetheless submitted thousands of false claims for simulations to Medicare.

10. Starting in September 2017 and continuing at least through December 31, 2025, Defendants thus received nearly two million dollars from their submission of false claims to Medicare for simulations.

## Jurisdiction and Venue

11. The United States brings this action under the FCA, 31 U.S.C. §§ 3729-3733, and under the common law theories of unjust enrichment and payment by mistake. This Court has jurisdiction over this action under 31 U.S.C. § 3730(a) and 28 U.S.C. § 1345.

12. This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a).

13. This Court may exercise personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a). This Court may also exercise personal jurisdiction over the Defendants because they transact business in this District and because they reside in this District.

## The Parties

14. Plaintiff, the United States of America, brings this action on behalf of the U.S. Department of Health and Human Services ("HHS"), and, specifically, its operating division, the Centers for Medicare & Medicaid Services ("CMS").

15. Relator, Colleen Van Egeren, is an individual who resides in Suamico, Wisconsin. Van Egeren is a licensed physician assistant in the State of Wisconsin with specialized training in dermatology. She was formerly employed by NDG.

16. Defendant NDG is a Wisconsin service corporation with its principal place of business at 3059 Voyager Drive, Green Bay, Wisconsin. NDG also operates seven other locations

in Green Bay, Appleton, Waupaca, New London, and Shawano, Wisconsin, and Iron Mountain and Escanaba, Michigan.

17. Dr. Lewis is a citizen of the United States who resides in Outagamie, Wisconsin. He is a physician licensed to practice medicine in Wisconsin and specializes in dermatology. Dr. Lewis is the owner of NDG.

## **Legal Background**

### The False Claims Act

18. The FCA provides, as relevant here, that any person who (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval, or (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim, is liable to the United States for damages and penalties. 31 U.S.C. §§ 3729(a)(1)(A)-(B).

19. The FCA defines the term "knowingly" to mean that a person, with respect to information, (1) has actual knowledge of the information, (2) acts in deliberate ignorance of the truth or falsity of the information, or (3) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1). No proof of specific intent to defraud is required to show that a person acted knowingly under the FCA. *Id.*

20. The FCA subjects defendants who violate the Act to civil penalties plus three times the amount of the damages the government sustains because of the defendants' actions. 31 U.S.C. § 3729(a).

### The Medicare Program

21. In 1965, Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, which is commonly known as the Medicare program. Entitlement to Medicare is based on

age, disability, or affliction with end-stage renal disease. 42 U.S.C. §§ 426, 426-1. CMS administers Medicare.

22. The Medicare program consists of four parts. NDG billed Medicare under Part B, which covers certain medical services, including outpatient services furnished by physicians and qualified providers. 42 U.S.C. § 1395k(a)(2)(B).

23. At all times relevant to this complaint, CMS contracted with its private contractors, referred to as Medicare Administrative Contractors ("MACs"), to act as agents in reviewing and paying claims submitted by health care providers to Medicare Part B. 42 U.S.C. §§ 1395h, 1395u; 42 C.F.R. §§ 421.3, 421.200, 421.400.

24. To participate in the Medicare program as a new provider enrollee, clinics and physicians like NDG and Dr. Lewis must submit Medicare enrollment applications. Once enrolled, clinics and physicians also must periodically revalidate their enrollment.

25. Medicare regulations require providers to certify that they meet and will continue to meet the requirements of the Medicare statute and regulations as well as all federal and state licensure, certification, and regulatory requirements for the type of services provided. 42 C.F.R. § 424.516(a).

26. Under Wisconsin and Michigan law, radiation technologists and radiographers may operate therapeutic radiation machines, produce images, and perform the technical aspects of certain radiology procedures, but they may not perform medical decision-making. Wis. Admin. Code DHS § 157.82(5)(a); Wis. Admin. Code RAD § 4.01(1); Mich. Admin. Code R. 333.5201-.5210.

27. Dr. Lewis, on his own behalf and on behalf of NDG, certified in their Medicare enrollment applications and revalidations that he agreed to "abide by the Medicare laws,

regulations and program instructions" and that he understood that "payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws."

Medicare Rules for Coverage and Payment of Services

28. Medicare only covers services that are reasonable and necessary for the diagnosis and treatment of an illness. 42 U.S.C. § 1395y(a)(1)(A).

29. In order to assess whether services are reasonable and necessary such that reimbursement is appropriate, Medicare requires providers to maintain complete documentation of services rendered to beneficiaries. *See* 42 C.F.R. § 424.516(f).

30. To obtain Medicare reimbursement for outpatient items or services, providers submit a claim form known as the CMS 1500 form ("CMS 1500") or its electronic equivalent known as the 837P form. To submit electronic claims on the 837P form, a provider must complete and submit to CMS an Electronic Data Interchange Enrollment Form pursuant to which the provider, among other things, agrees that it will "submit claims that are accurate, complete, and truthful."

31. When a provider submits a claim to Medicare, the provider must identify the services rendered to a patient using billing codes contained in the Healthcare Common Procedural Coding System ("HCPCS"). HCPCS incorporates Common Procedural Terminology ("CPT") billing codes issued by the American Medical Association ("AMA"). 45 C.F.R. § 162.1002(c).

32. By submitting a claim to Medicare using a CPT code that corresponds to a specific service, a medical provider represents to Medicare that it has provided that specific service. Accordingly, if a provider uses a payment code but fails to disclose that it did not comply with the requirements of that code, its claim is false. *Universal Health Servs. Inc. v. United States*, 579 U.S. 176, 189-90 (2016).

CPT Codes for Superficial Radiation Therapy

33. In the CPT code set, the AMA established codes for radiation oncology services.

34. NDG used these radiation oncology codes to bill Medicare for SRT-related services during the relevant time.

35. The AMA established codes applicable to the various phases of a course of SRT, including initial consultation, clinical treatment planning, treatment delivery, and treatment management and follow-up care.

36. During the relevant time, the AMA defined the clinical treatment planning process as "a complex service" and established, as part of that process, codes for simulation.

37. The AMA defined simulation as "the process of defining relevant normal and abnormal target anatomy, and acquiring the images and data necessary to develop the optimal radiation treatment process for the patient."

38. A simulation is thus a clinical service in which a physician (or other qualified provider) obtains data and images necessary to create the treatment plan for the delivery of radiation therapy. Typically, as part of the simulation, the physician or other qualified provider will measure the target anatomy, place marks on the patient's skin to define the radiation target area, and create shields or other devices to deliver the radiation safely only to the cancer. AMA, CPT Assistant (April 2009).

39. During the relevant time, the AMA established three codes for simulation: 77280, 77285, and 77290.

a. CPT code 77280 applied to "simple" simulations, *i.e.*, a simulation of a single treatment area.

b. CPT code 77285 applied to "intermediate" simulations, *i.e.*, a simulation of two separate treatment areas.

c. CPT code 77290 applied to "complex" simulations, *i.e.*, a simulation of three or more treatment areas, or any number of treatment areas if any of the following are involved: particle, rotation, or arc therapy, complex blocking, custom shielding blocks, brachytherapy simulation, hyperthermia probe verification, or the use of contrast materials.

40. Because simulation is a planning service, a simulation occurs prior to delivery of the radiation and is typically reported only once per a course of treatment. AMA, CPT Assistant (Oct. 1997).

41. At times, however, one or more additional simulations may be necessary if there is an identified medical need to modify or confirm the existing plan established at the initial simulation. AMA, CPT Assistant (March 1991) (explaining that, in the treatment of a patient with head and neck cancer, a second simulation was necessary midway through the course of treatment to move the treatment field away from the patient's spinal cord).

42. The AMA also established a separate CPT code for radiation treatment delivery during a course of SRT. Specifically, CPT code 77401 covers SRT treatment delivery and is reported once per treatment session. CPT code 77401 covers all services associated with the delivery of SRT at a treatment session, including setting up the patient and managing treatment.

## Defendants' Scheme to Defraud Medicare

### NDG's Dermatology Practice

43. NDG and Dr. Lewis specialize in dermatology.

44. Dr. Lewis owns NDG and directly treats patients at NDG.

45. Dr. Lewis also oversees physician assistants and other staff in their treatment of dermatological patients at NDG. Currently, NDG advertises that it employs 20 physician assistants across its eight locations.

46. At times, NDG also employed a second physician. Dr. Rene Earles worked at NDG from 2017 through approximately 2020. Dr. Steven Armus began working at NDG in 2025.

NDG's Provision of SRT

47. Whether a patient saw a physician or physician assistant, if the patient was diagnosed with non-melanoma skin cancer, NDG offered several treatment options, including surgical treatment or, starting in September 2017, SRT.

48. Within the field of dermatology, surgical treatments such as excision or Moh's surgery are commonly considered the first-line treatment for non-melanoma skin cancers. SRT is considered an effective alternative treatment for patients who are not good surgical candidates or who prefer not to receive surgery.

49. From September 2017 through February 2022, NDG offered SRT only at its Voyager Avenue, Green Bay, Wisconsin, location (the "Voyager Avenue location"). During this time, an entity affiliated with NDG—Health Management Partners LLC—employed one or at most two radiation technicians at a time who performed SRT.

50. Health Management Partners LLC purchased, and the radiation technicians used, a device manufactured by Sensus Healthcare ("Sensus") called the SRT-100 to perform the SRT.



51. Starting in February 2022, NDG also offered SRT at its Iron Mountain, Michigan, location (the "Iron Mountain location") in addition to the Voyager Avenue location. NDG entered

an arrangement with SkinCure Oncology ("SkinCure") through which SkinCure provided radiation therapists to perform SRT at the Iron Mountain location and, starting in May 2022, the Voyager Avenue location.

52. SkinCure also provided a device at the Iron Mountain and Voyager Avenue locations manufactured by Sensus called the SRT-100 Vision to perform the SRT. Unlike the SRT-100, the SRT-100 Vision incorporated ultrasound technology that could be used to provide imaging of the treatment area.

53. Under the base terms of its contractual arrangement with SkinCure, NDG paid SkinCure the greater of 55% of NDG's net collections for SRT services or $2,500 for each course of SRT provided to a patient.

54. At NDG, a typical course of SRT involved the following:

a. A consultation with a physician or physician assistant during which the patient received a clinical assessment and underwent a skin biopsy that ultimately showed non-melanoma skin cancer.

b. An initial SRT visit at which the patient underwent a simulation to develop the treatment plan and dosimetry to calculate the radiation dose.

c. Approximately 17-20 SRT treatment visits at which the radiation technician or radiation therapist delivered the radiation, typically 2-3 times per week for up to 10 weeks.

<u>Defendants' False Claims for Simulation</u>

55. During the initial SRT visit described in paragraph 54.b, a radiation technician or radiation therapist performed the technical aspects of a simulation. The technician or therapist measured and marked the lesion and treatment margin with a permanent marker, created a custom lead shield that was used during the subsequent treatment sessions to direct the radiation, established and photographed the patient setup to guide the subsequent treatment sessions, and calculated the radiation dose.

56. Starting in 2022 when NDG began to use the SRT-100 Vision device, the radiation therapists also used ultrasound to obtain images and evaluate the tumor depth during the initial SRT visit. The performance of ultrasound imaging is a separate and distinct service from the performance of a simulation. Indeed, NDG separately billed and received reimbursement from Medicare for ultrasounds performed during the initial SRT visits under HCPCS code G6001.

57. No radiation treatment was delivered during these initial SRT visits. These initial SRT visits typically lasted approximately 30 minutes.

58. For example, after being diagnosed with squamous cell carcinoma on her left ankle, patient L.K. had an initial SRT visit at NDG on April 12, 2018. According to NDG's records, the radiation technician measured L.K.'s lesion and treatment margin, marked those areas on her skin with permanent marker, created a custom lead shield, selected the field applicator size and radiation dosage, setup the patient in the proper alignment for treatment, and took photographs of the patient setup to guide the subsequent treatment sessions.




59. When NDG submitted bills to Medicare associated with these initial SRT visits, NDG submitted (among others) a claim for a simulation under CPT code 77280, 77285, or 77290. Medicare typically paid NDG approximately $200 to $400 for each of these simulation claims.

The United States does not assert that NDG's claims associated with these initial SRT visits for simulation were false.

60. After the initial SRT visit at which the patient received a simulation, the patient subsequently returned to NDG for the SRT treatment visits described in paragraph 54.c. During these treatment visits, a radiation technician or radiation therapist aligned the patient and the custom shield consistent with the markings and setup established at the simulation performed at the initial SRT visit. Once the patient was properly set up, the technician or therapist delivered the radiation dose to the patient.

61. At the SRT treatment visits, the technician or therapist typically did not take new measurements of the lesion or treatment margin, make new markings on the patient, or create new shielding.

62. Neither Dr. Lewis nor any of NDG's other qualified medical providers typically reassessed or modified the patient's treatment plan during SRT treatment visits. To the contrary, typically no physician or physician assistant was actively involved in the SRT treatment visits.

63. NDG thus did not provide any of the services covered by the simulation CPT codes at SRT treatment sessions.

64. Instead, at the SRT treatment visits, the technician or therapist delivered the radiation consistent with the existing plan established during the simulation performed at the initial SRT visit. The SRT treatment visits were typically much shorter in duration than the initial SRT visits, often lasting 10 minutes or less.

65. Starting in 2022 when NDG began to use the SRT-100 Vision device, the radiation therapists also used ultrasound to obtain images of the tumor at the SRT treatment sessions. As noted, the performance of ultrasound imaging is a separate and distinct service from the

performance of a simulation, and NDG separately billed and received reimbursement from Medicare for ultrasounds performed during SRT treatment visits under HCPCS code G6001.

66. Dr. Lewis and NDG's other qualified medical providers rarely modified the treatment plan established during the simulation performed at the initial SRT visit based on ultrasound imaging obtained during SRT treatment visits.

67. NDG routinely submitted bills to Medicare requesting payment for patients' SRT treatment visits that included—for each visit—both a claim under the CPT codes for simulation (77280, 77285, or 77290) and a claim under CPT code 77401 for treatment delivery. As noted, Medicare typically paid NDG approximately $200 to $400 for each simulation claim, but only approximately $20 for each claim under CPT code 77401.

68. NDG's claims to Medicare for simulation associated with SRT treatment visits were false because NDG did not actually perform the services necessary to bill under the simulation codes at SRT treatment visits.

69. NDG's claims to Medicare for simulation associated with SRT treatment visits were also false because performance of a simulation at each SRT treatment visit was not reasonable and necessary for treatment.

70. For example, patient L.K. returned to NDG for 17 SRT treatment visits from April 17, 2018, through June 19, 2018. The radiation technician did not take any new measures, make any new markings on L.K., or fabricate any new shielding at these treatment visits. Likewise, neither Dr. Lewis nor any other clinician reassessed or modified L.K.'s treatment plan during these SRT treatment visits. Instead, the radiation technician set up L.K. consistent with the plan established at the initial SRT visit and delivered the radiation to treat L.K.'s cancer. NDG thus did not perform any additional simulations at L.K.'s treatment visits.

71. NDG, however, submitted claims under CPT code 77280 to Medicare that falsely represented that NDG performed a simulation at each of L.K.'s SRT treatment sessions. NDG's claims also falsely represented that Dr. Lewis was the rendering provider of these simulations. NDG's claims further falsely represented that such simulations were reasonable and necessary for treatment. Medicare paid NDG $3,666.90 for these false claims for simulation.

<u>Defendants' Knew Their Simulation Claims Were False</u>

72. NDG and Dr. Lewis knew that Medicare only paid claims for services that were actually rendered as billed and that were reasonable and necessary for treatment.

73. NDG and Dr. Lewis, moreover, received multiple warnings from medical coding consultants and private insurers that NDG's claims for simulation at SRT treatment sessions were improper. Nonetheless, NDG submitted, and Dr. Lewis caused NDG to submit, false claims to Medicare for simulation at SRT treatment sessions.

74. As noted above, NDG used equipment manufactured by Sensus to provide SRT. Sensus retained The Pinnacle Health Group ("PHG"), a medical billing and coding consultant firm, to provide support for clinics that purchased Sensus's equipment.

75. NDG and Dr. Lewis received multiple warnings from PHG stating that NDG could not routinely bill for a simulation at each SRT treatment session.

76. Shortly after NDG began offering SRT, in October 2017, one of NDG's physician assistants, David Orr, contacted PHG. In response to Orr's questions, PHG provided information to NDG about the appropriate use of the CPT codes for simulation and radiation treatment delivery.

77. Specifically, in an email dated October 3, 2017, PHG advised NDG that NDG could bill insurance for a simulation for the initial SRT visit because NDG completed the requisite services at those visits, such as creating a custom shield and marking the treatment area. PHG, however, did not advise NDG that NDG could bill additional simulations for each subsequent SRT

treatment visit. Instead, PHG informed NDG that additional simulations (which PHG referred to as "verification simulations") were only appropriate (a) if no visible markers remained on the patient or (b) if the physician, midway through the treatment, determined that a second simulation was needed to determine if a change in treatment was necessary.

78. In February 2019, NDG received a second warning from PHG. Specifically, Jodie Maddux, who handled billing for NDG at that time, contacted PHG for guidance about the use of CPT code 77280. In response, in an email dated February 14, 2019, PHG again informed NDG that verification simulations were only appropriate (a) if no visible markers remained on the patient or (b) if the physician, midway through the treatment, determined that a second simulation was needed to determine if a change in treatment was necessary. PHG did not advise NDG that it was appropriate to bill for a simulation for each SRT treatment visit.

79. Maddux forwarded PHG's February 14, 2019, email to Dr. Lewis.

80. In January 2021, NDG received a third warning from PHG. Specifically, one of NDG's radiation technicians contacted PHG about the CPT codes for simulation and radiation treatment delivery.

81. In response, PHG explained these codes to NDG's radiation technician. PHG also sent NDG an email with guidance concerning the appropriate use of the CPT codes for simulation. PHG explicitly warned NDG that the work of aligning the treatment on the patient's skin surface is an element of treatment set-up and is not separately billable as a verification simulation for each SRT treatment session. PHG also repeated its prior guidance that verification simulations were only appropriate (a) if no visible markers remained on the patient or (b) if the physician, midway through the treatment, determined that a second simulation was needed to determine if a change in treatment was necessary.

82. On April 28, 2023, Dr. Lewis contacted PHG and asked for assistance because NDG was undergoing a Medicare audit.

83. Based on the timing of Dr. Lewis's inquiry, his reference to a Medicare audit likely referred to the government's investigation leading to this complaint-in-intervention.

84. In response, PHG sent Dr. Lewis an email that included guidance concerning the appropriate use of the CPT codes for simulation. PHG explicitly warned Dr. Lewis that "the work of aligning the treatment on the patient's skin surface is an element of treatment set-up and is **not separately billable as a verification simulation for each treatment session.**" (emphasis added). PHG also explicitly warned Dr. Lewis that "simulation may be reported at the initiation of treatment or after a significant change in field design. It should not be reported for daily positioning of the treatment field."

85. As noted, NDG's radiation technicians and radiation therapists used permanent marker to mark the lesion and treatment margin on a patient's body during the initial SRT visit. As testified by former NDG radiation technicians, these markings typically remained visible and were used throughout the course of treatment. If the markings began to fade, moreover, NDG staff simply retraced them in permanent marker without conducting new measurements. In addition, neither Dr. Lewis nor any other physician at NDG instructed the radiation technicians or therapists to conduct a second simulation midway through the course of treatment. Nothing in PHG's guidance, therefore, supported NDG's claims for simulations at the SRT treatment sessions.

86. Notwithstanding these warnings from PHG, NDG continued to submit claims to Medicare for a simulation at each SRT treatment session.

87. Indeed, NDG and Dr. Lewis failed even to provide PHG's warnings to NDG's billing staff. For example, when one billing employee, Wendy Justus, raised questions about appropriate coding for SRT-related services, NDG had already received the first two warnings

from PHG described above. Nonetheless, neither Dr. Lewis nor anyone else at NDG shared PHG's warnings with Justus.

88. PHG later stopped working with Sensus, and Sensus retained another medical coding and billing consulting firm, MedIQ Healthcare Solutions ("MedIQ"), to provide guidance to clinics that used Sensus's equipment.

89. Dr. Lewis contacted MedIQ in October 2025 concerning the CPT codes for simulation. In response, MedIQ provided Dr. Lewis with an SRT Coding and Reimbursement Guide. In that guide, MedIQ stated that verification simulations should be provided only "as necessary" and included a reimbursement model that stated that approximately three verification simulations may be necessary in a course of SRT with 15 treatment sessions. Like PHG, therefore, MedIQ did not advise NDG or Dr. Lewis that it was appropriate to bill for a simulation at each SRT treatment visit.

90. Private insurers also warned NDG and Dr. Lewis that NDG could not bill a simulation for each SRT treatment session. For example, in January 2019, Justus told Dr. Lewis that an insurer informed her that NDG could only bill for an initial simulation prior to treatment and one verification simulation during the course of treatment; the insurer explicitly stated that a simulation could not be billed for each SRT treatment session.

91. This insurer's warning was not an isolated incident. NDG and Dr. Lewis knew that many private insurers would not pay for a simulation at each SRT treatment session. Dr. Lewis even requested that SkinCure provide an analysis of the difference in payment for a course of SRT by Medicare and private insurers. SkinCure's analysis assumed that Medicare would pay for simulation at the initial SRT visit and 20 SRT treatment visits, whereas private insurers would pay for only one simulation in the entire course of treatment. Driven in large part by this difference,

SkinCure estimated that Medicare would pay roughly nine times more than private insurers for the same course of SRT treatment:

EX (Rough estimate): Medicare will cover 80% of $11,776.19, so an estimated payment of $9,420.95, patient portion $2.355.24

**Medicare (Although it says "National" below, these rates are specific to Michigan from CMS website):**

20 Fractions Single Lesion Reimbursement for Medicare

| CPT CODE | DESCRIPTION | Number of Units Per Course | National Average Global MAC Reimbursement Allowable | Totals Based on the Number of Units | Primary | Secondary | Total |
|---|---|---|---|---|---|---|---|
| 77261 | Therapeutic Radiology Treatment Planning | 1 | 69.79 | 69.79 | 55.83 | 13.96 | 69.79 |
| 77280 | Image Guided Field Placement | 21 | 253.22 | 5,317.62 | 4,254.10 | 1,063.52 | 5,317.62 |
| 77300 | Radiation Therapy Dose Plan-Field Calculation | 1 | 62.20 | 62.20 | 49.76 | 12.44 | 62.20 |
| 77331 | Special Radiation Dosimetry | | | 0.00 | 0.00 | 0.00 | 0.00 |
| 77334 | Radiation Treatment Aid(s) | 1 | 125.97 | 125.97 | 100.78 | 25.19 | 125.97 |
| 77336 | Radiation Physics Consult Weekly | 4 | 84.09 | 336.36 | 269.09 | 67.27 | 336.36 |
| 77401 | SRT Delivery | 20 | 38.49 | 769.80 | 615.84 | 153.96 | 769.80 |
| 77427 | Radiation Management Weekly | 4 | 186.57 | 746.28 | 597.02 | 149.26 | 746.28 |
| 99212 | Simple Office Visit | | 57.45 | 0.00 | 0.00 | 0.00 | 0.00 |
| 99213 | Intermediate Office Visit | | 92.05 | 0.00 | 0.00 | 0.00 | 0.00 |
| 99214 | Complex Office Visit | 1 | 124.42 | 124.42 | 99.54 | 24.88 | 124.42 |
| G6001 | Ultrasound Evaluation - Ultrasound Guidance | 25 | 168.95 | 4,223.75 | 3,379.00 | 844.75 | [illegible] |
| | | | | | 9,420.95 | 2,355.24 | 11,776.19 |

20 Fractions Single Lesion Reimbursement for Cigna, BCN and BCBS MI plans that require Authorization through Evicore

| CPT CODE | DESCRIPTION | Number of Units Per Course | National Average Global MAC Reimbursement Allowable | Totals Based on the Number of Units | Primary | Secondary | Total |
|---|---|---|---|---|---|---|---|
| 77261 | Therapeutic Radiology Treatment Planning | | 69.79 | 0.00 | 0.00 | 0.00 | 0.00 |
| 77280 | Image Guided Field Placement | 1 | 253.22 | 253.22 | 202.58 | 50.64 | 253.22 |
| 77300 | Radiation Therapy Dose Plan-Field Calculation | 1 | 62.20 | 62.20 | 49.76 | 12.44 | 62.20 |
| 77331 | Special Radiation Dosimetry | | | 0.00 | 0.00 | 0.00 | 0.00 |
| 77334 | Radiation Treatment Aid(s) | | 125.97 | 0.00 | 0.00 | 0.00 | 0.00 |
| 77336 | Radiation Physics Consult Weekly | | 84.09 | 0.00 | 0.00 | 0.00 | 0.00 |
| 77401 | SRT Delivery | 20 | 38.49 | 769.80 | 615.84 | 153.96 | 769.80 |
| 77427 | Radiation Management Weekly | | 186.57 | 0.00 | 0.00 | 0.00 | 0.00 |
| 99212 | Simple Office Visit | | 57.45 | 0.00 | 0.00 | 0.00 | 0.00 |
| 99213 | Intermediate Office Visit | | 92.05 | 0.00 | 0.00 | 0.00 | 0.00 |
| 99214 | Complex Office Visit | 1 | 124.42 | 124.42 | 99.54 | 24.88 | 124.42 |
| G6001 | Ultrasound Evaluation - Ultrasound Guidance | | 168.95 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | | | | 967.71 | 241.93 | 1,209.64 |

92. After learning that private insurers did not cover simulations at SRT treatment sessions, rather than investigate whether routinely billing Medicare for simulation for SRT treatment visits was appropriate, NDG's Orr, with Dr. Lewis's approval, told NDG's other providers that any patient with Medicare coverage who lived close to the Voyager Avenue or Iron Mountain locations was "a prime candidate for SRT!!!"

<u>Defendants' False Claims Were Material</u>

93. Medicare was not aware at the time that NDG submitted the claims at issue in this case that NDG had not, in fact, actually performed the services necessary to bill under the simulation CPT codes at SRT treatment visits.

94. Medicare was likewise not aware at the time that NDG submitted the claims at issue in this case that the performance of a simulation at each SRT treatment visit was not actually reasonable and necessary to treatment of NDG's patients.

95. Had Medicare been aware that NDG submitted claims for simulations that were not actually performed as billed or that were not reasonable and necessary for treatment, Medicare would not have paid NDG for those claims.

Defendants' False Claims to Medicare

96. Every claim submitted or caused to be submitted by Defendants to Medicare for a simulation that was (a) not actually furnished as billed or (b) not reasonable and necessary for treatment constitutes a false or fraudulent claim.

97. NDG and Dr. Lewis knew that the claims submitted to Medicare for simulation at SRT treatment sessions were false or acted in deliberate ignorance or reckless disregard of the truth or falsity of those claims.

98. During the relevant time, Medicare paid NDG the following reimbursement for false claims for simulations:

| Year | Number of False Simulation Claims | Amount Paid by Medicare |
|---|---|---|
| 2017 | 123 | $37,884.53 |
| 2018 | 538 | $146,450.08 |
| 2019 | 514 | $137,885.24 |
| 2020 | 380 | $92,652.13 |
| 2021 | 304 | $76,424.42 |
| 2022 | 1,337 | $270,363.81 |
| 2023 | 952 | $187,303.61 |
| 2024 | 2,068 | $405,076.02 |
| 2025 | 3,336 | $640,969.83 |
| Total | 9,552 | $1,995,009.67 |

Example #1 – False Claims for Patient L.K.

99. As described in paragraphs 58 and 70-71, patient L.K. received a course of SRT treatment at NDG for squamous cell carcinoma located on her left ankle from April 12, 2018, through June 19, 2018.

100. During that course of treatment, NDG submitted seventeen claims to Medicare for simulations purportedly performed during SRT treatment visits:

| **Date** | **Procedure Code Submitted** | **Amount Paid by Medicare** |
|---|---|---|
| 4/17/2018 | 77280 | $215.70 |
| 4/19/2018 | 77280 | $215.70 |
| 4/24/2018 | 77280 | $215.70 |
| 4/26/2018 | 77280 | $215.70 |
| 5/1/2018 | 77280 | $215.70 |
| 5/3/2018 | 77280 | $215.70 |
| 5/8/2018 | 77280 | $215.70 |
| 5/10/2018 | 77280 | $215.70 |
| 5/15/2018 | 77280 | $215.70 |
| 5/17/2018 | 77280 | $215.70 |
| 5/22/2018 | 77280 | $215.70 |
| 5/24/2018 | 77280 | $215.70 |
| 6/5/2018 | 77280 | $215.70 |
| 6/7/2018 | 77280 | $215.70 |
| 6/12/2018 | 77280 | $215.70 |
| 6/14/2018 | 77280 | $215.70 |
| 6/19/2018 | 77280 | $215.70 |
| Total | | $3,666.90 |

101. All the claims identified in paragraph 100 were false because NDG did not actually perform a simulation billable under CPT code 77280 at those SRT treatment visits.

102. All the claims identified in paragraph 100 were also false because a simulation was not reasonable and necessary for the treatment of L.K.'s skin cancer at those SRT treatment visits.

103. Defendants knew that these claims were false, yet submitted them to Medicare anyway, thereby receiving $3,666.90 to which they were not entitled.

Example #2 – Patient G.T.

104. In May 2022, patient G.T. was diagnosed with two squamous cell carcinomas, one on his scalp and the other on his temple.

105. On May 12, 2022, patient G.T. had an initial SRT visit at which he purportedly received a simulation. NDG's records, however, do not show that any custom lead shields were created for his two lesions during the May 12th visit and do not contain photographs showing marking of G.T.'s lesions or treatment area or photographs of his treatment setup. NDG submitted a claim to Medicare for a simulation for this visit under CPT code 77285 and was paid $340.38.

106. On May 17, 2022, patient G.T. had another visit at NDG at which he received a simulation without receiving treatment. NDG's records state that two custom lead shields were created for his lesions during the May 17th visit and contain photographs showing marking of G.T.'s lesions and treatment area. NDG submitted a claim to Medicare for simulation for this visit under CPT code 77285 and was paid $340.38.

107. Patient G.T. subsequently returned to NDG for eighteen SRT treatments visits from May 19, 2022, through July 8, 2022. NDG submitted eighteen claims to Medicare for simulations purportedly performed during patient these SRT treatment visits:

| Date | Procedure Code Submitted | Amount Paid by Medicare |
|---|---|---|
| 5/19/2022 | 77280 | $205.74 |
| 5/20/2022 | 77280 | $205.74 |
| 5/24/2022 | 77280 | $205.74 |
| 5/26/2022 | 77280 | $205.74 |
| 5/27/2022 | 77280 | $205.74 |
| 5/31/2022 | 77280 | $205.74 |
| 6/2/2022 | 77280 | $205.74 |
| 6/16/2022 | 77280 | $205.74 |
| 6/17/2022 | 77280 | $205.74 |
| 6/21/2022 | 77280 | $205.74 |
| 6/23/2022 | 77280 | $205.74 |
| 6/24/2022 | 77280 | $205.74 |
| 6/28/2022 | 77280 | $205.74 |
| 6/30/2022 | 77280 | $205.74 |
| 7/1/2022 | 77280 | $203.66 |
| 7/5/2022 | 77280 | $203.66 |

| Date | Procedure Code Submitted | Amount Paid by Medicare |
|---|---|---|
| 7/7/2022 | 77280 | $203.66 |
| 7/8/2022 | 77280 | $203.66 |
| Total | | $3,695.00 |

108. All the claims identified in paragraph 107 were false because NDG did not actually perform a simulation billable under CPT code 77280 at those SRT treatment visits.

109. Indeed, NDG's records for these SRT treatment visits include template notes that contain nearly identical narratives for each purported simulation. None of those narratives, however, contain any information showing that Dr. Lewis or any other qualified provider assessed or modified the treatment plan. Several of these narratives, in fact, contain a blank space where any such assessment or modification should be documented, as shown by this example from a note regarding a visit on May 24, 2022:

**SkinCure SRT - Treatment (2 lesions):**

This patient has been treated today with image guided superficial radiation therapy for non-melanoma skin cancer. Written informed consent has been previously obtained from this patient for this treatment. This consent is documented in the patient's chart. The patient gave verbal consent to continue treatment today. The patient was treated with a specific radiation dose and setup as prescribed by the provider listed on this visit note. A Radiation Therapist performed administration of radiation under supervision of provider. The treatment parameters and cumulative dose are indicated above. Prior to administering the radiation, the patient underwent a verification therapeutic radiology simulation-aided field setting defining relevant normal and abnormal target anatomy and acquiring images with high frequency ultrasound in addition to data necessary developing optimal radiation treatment process for the patient. This process includes verification of the treatment port(s) and proper treatment positioning. All treatment ports were photographed within electronic medical record. The patient's customized lead blocking along with gross tumor volume and margin was confirmed. Considering superficial radiotherapy is clinical in setup, this requires physician and radiation therapist to clarify location interest being treated against initial images, pathology and patient anatomy. Care was taken ensuring fields treated were geometrically accurate and properly positioned using therapeutic radiology simulation-aided field setting verification per fraction. This process is also utilized to determine if any prescription or setup changes are necessary. These steps are therefore medically necessary ensuring safe and effective administration of radiation. Ongoing therapeutic radiology simulation-aided field setting verification is ordered throughout course of therapy. A high frequency ultrasound image was acquired today for two-dimensional evaluation of the tumor volume and response to treatment, in addition to geometric accuracy of field placement. US depth for lesion 1 is 1.56mm, which is 0.53mm in difference from previous imaging and US depth for lesion 2 is 1.13mm, which is 0.76mm in difference from previous imaging. The field placement and ultrasound imaging, per fraction, is separate and distinct from the initial simulation, and is an important task in providing safe administration of superficial radiation therapy. Physician evaluation of the ultrasound tumor depth will be ongoing throughout the course of treatment and is deemed medically necessary in order to ensure the efficacy of treatment and any necessary changes. Today's image was evaluated for determination of continuation of treatment with the current plan or with necessary changes as appropriate. According to provider review of verification therapeutic radiology simulation-aided field setting and imaging, . Additionally, the use of ultrasound visualization and targeted assessment allows the patient to be able to see their cancer(s) progress, encouraging patient to complete and maintain compliance through full course of radiotherapy. Per Dr. Kevan Lewis, continued ultrasound guidance and therapeutic radiology simulation-aided field setting verification per fraction is required for field placement, measurement of tumor depth, progress and acute effect monitoring.

110. NDG's records for these SRT treatment visits document that the radiation therapist used ultrasound to image patient G.T.'s tumors. Nothing in NDG's records, however, shows that

Dr. Lewis or any other qualified provider used those images to conduct a simulation during those SRT treatment visits.

111. As with patient L.K., NDG's claims to Medicare for the simulations identified in paragraph 107 also falsely asserted that Dr. Lewis was the rendering provider.

112. All the claims identified in paragraph 107 are also false because a simulation was not reasonable and necessary for the treatment of G.T.'s skin cancers at those SRT treatment visits.

113. Defendants knew that these claims were false, yet submitted them to Medicare anyway, thereby receiving $3,695.00 to which they were not entitled.

## Claims for Relief

### Count One: False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(A))

114. The United States incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

115. Defendants knowingly submitted, or caused to be submitted, false and fraudulent claims for payment to the United States, including claims to Medicare for reimbursement for simulation under CPT codes 77280, 77285, and 77290 for simulations (a) that were not actually rendered as billed and (b) that were not reasonable and necessary for treatment.

116. Defendants submitted or caused the submission of these false and fraudulent claims with actual knowledge of their falsity or with reckless indifference or deliberate ignorance of whether they were false.

117. Whether the simulations for which Defendants sought reimbursement were actually rendered as billed or were reasonable and necessary for treatment are material facts to Medicare's decision to pay Defendants.

118. By virtue of the false and fraudulent claims that Defendants submitted or caused to be submitted to Medicare, the United States suffered damages and is entitled to recover treble damages plus a civil monetary penalty for each false or fraudulent claim.

**Count Two: False Statements Material to False Claims (31 U.S.C. § 3729(a)(1)(B))**

119. The United States incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

120. Defendants knowingly made, used, or caused to be made or used false records or statements material to the false and fraudulent claims they made to Medicare, including: (a) false statements by NDG and Dr. Lewis on their Medicare enrollment and revalidation forms and on their claims to Medicare regarding their compliance with Medicare regulations and rules; and (b) false patient and billing records that misrepresented that simulations were actually rendered and/or were reasonable and necessary for treatment.

121. Defendants made such false records and statements with actual knowledge of their falsity or with reckless disregard or deliberate indifference to whether they were false.

122. By virtue of Defendants' false records and statements, the United States suffered and is entitled to recover treble damages plus a civil monetary penalty for each false or fraudulent claim.

**Count Three: Unjust Enrichment**

123. The United States incorporates and re-alleges all the preceding paragraphs as if fully set forth.

124. The United States claims the recovery of all monies by which Defendants have been unjustly enriched, including all money Defendants received from Medicare and profits earned by Defendants because of the conduct described herein.

125. The United States conferred a benefit on Defendants, namely, the Medicare reimbursement which Defendants received as a result of their claims for simulations that were not rendered as billed and/or not reasonable and necessary for treatment. At the time the United States paid this benefit to Defendants, the United States was not aware that the simulations were not rendered as billed and/or not reasonable and necessary for treatment.

126. Defendants had knowledge and appreciation of the benefit paid by the United States.

127. By retaining the monies received for the conduct described herein, Defendants were unjustly enriched at the expense of the United States in an amount to be determined and, which in equity and good conscience, should be returned to the United States.

**Count Four: Payment by Mistake**

128. The United States incorporates and re-alleges all the preceding paragraphs as if fully set forth.

129. The United States mistakenly and erroneously paid Medicare reimbursement to Defendants for simulations that were not rendered as billed and/or not reasonable and necessary for treatment. Had the United States been aware that Defendants did not render these simulations or that they were not reasonable and necessary for treatment, the United States would not have paid such Medicare reimbursement to Defendants.

130. The United States is therefore entitled to recover all amounts mistakenly and erroneously paid to Defendants. *United States v. Wurts*, 303 U.S. 414, 426 (1938).

**Prayer for Relief**

WHEREFORE, the United States demands and prays that judgment be entered in its favor against each of the Defendants as follows:

I. On the First and Second Counts under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are authorized by law, together with all such further relief as may be just and proper.

II. On the Third and Fourth Counts for unjust enrichment and payment by mistake, for the damages sustained, the amounts by which the Defendants were unjustly enriched, and/or the amounts which the Defendants retained erroneously, plus interest, costs, and expenses, and for all such further relief as may be just and proper.

**The United States demands a jury trial on each of the issues so triable in this case.**

Respectfully submitted this 1st day of October, 2026.

By: /s Michael Carter

MICHAEL CARTER
Assistant United States Attorney
Eastern District of Wisconsin
State Bar No. 1090041
517 East Wisconsin Avenue
Milwaukee, WI 53202
(414) 297-4101
Fax: (414) 297-4394
michael.a.carter@usdoj.gov